**Madella HENDERSON, Plaintiff,**

v.

**INTERNATIONAL UNION, et al., Defendants.**

**No. CIV.A. 00–2575–CM.**

United States District Court, D. Kansas.

June 6, 2003.

Ruth M. Benien, Benien Law Offices, Chtd., Kansas City, KS, Sally A. Howard, Sarah A. Brown, Parkinson, Foth, Orrick & Brown LLP, Lenexa, KS, for Madella Henderson.

Bruce C. Jackson, Jr., Mark A. Kistler, Arnold, Newbold, Winter, Jackson, and Jacoby, P.C., Kansas City, MO, for Intern. Union, United Auto, Aerospace and Agr. Implement Workers of America, UAW.

David C. Vogel, Rosalee M. McNamara, Patrick M. Gavin, Lathrop & Gage L.C., Kansas City, MO, for General Motors Corp.

## MEMORANDUM AND ORDER

MURGUIA, District Judge.

Plaintiff Madella Henderson filed suit against defendants International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW), Local No. 31 of the International Union, United Automobile, Aerospace and Agricultural Workers of America (Local 31) (referred to collectively as "the Union"), and General Motors Corporation (GM). Plaintiff alleges that defendants discriminated against her on the basis of her race and sex in violation of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e et seq.; her age in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 et seq.; her race in violation of 42 U.S.C. § 1981; and her disability in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12001 et seq. This matter is before the court on defendants UAW and Local 31's Motion for Summary Judgment (Doc. 76) and defendant GM's Motion for Summary Judgment (Doc. 78).

## I. Facts [1]

Plaintiff is a 54 year-old African–American woman who has been employed for more than 25 years at the Fairfax assembly plant operated by GM. Plaintiff alleges she was the victim of pervasive harass-

---

[1] The court construes the facts in the light most favorable to plaintiff as the non-moving party pursuant to Fed.R.Civ.P. 56. However, in some instances, plaintiff failed to cite to the record. In other instances, the record simply did not support plaintiff's factual contentions. The court will therefore exclude from this opinion those factual contentions which con-tain no support in the record. The court also excludes those factual contentions which are based on inadmissible hearsay. Adams v. Am. Guar. & Liab. Ins. Co., 233 F.3d 1242, 1246 (10th Cir.2000) ("Hearsay testimony that would be inadmissible at trial cannot be used to defeat a motion for summary judgment.").

ment, discrimination, and retaliation during the course of her employment. Specifically, plaintiff contends she was harassed and treated differently in the terms and conditions of her employment than comparable white co-workers and male co-workers and union members. Plaintiff also asserts she has or is regarded as having disabilities to her neck, shoulders, arms, back, knee, and ankle and that she has been regarded as having or has a record of a mental impairment. Plaintiff claims she was harassed and treated differently in the terms and conditions of her employment than comparable nondisabled co-workers and union members and that defendants failed to assist plaintiff with her requests for reasonable accommodations. Plaintiff also alleges she was harassed and treated differently in the terms and conditions of her employment than younger co-workers and union members.

With respect to plaintiff's claims against the Union, plaintiff claims that the Union harassed, discriminated, and retaliated against her on the basis of her race, sex, age, and disability. Plaintiff also alleges that her complaints of discrimination and harassment against GM were disregarded and that the Union failed to represent or assist her with regard to her complaints. Finally, plaintiff contends that the Union is liable for failure to take any action against GM's alleged discriminatory practices.

The record in this case in voluminous. Moreover, in response to defendants' summary judgment motions, plaintiff has set forth collectively more than six hundred additional facts, some of which are duplicative, which plaintiff claims are evidence of defendants' discriminatory conduct. The court will attempt to categorize the facts of this case. However, in some instances, plaintiff's factual assertions do not make clear on what basis plaintiff claims discrimination. With respect to those factual assertions, the court will include a section setting forth plaintiff's contentions in an effort to consider each and every allegation. The length of this decision is not necessarily an indication of the merits of plaintiff's claims. Rather, the court has attempted to fully consider every contention made by plaintiff.

## A. Specific Incidences of Alleged Discrimination

### 1. The Noose Incidents

In September 1998, Mildred Woody, another African–American employee at the plant, found what appeared to be a noose at her work station. The noose was made from a piece of flexible rubber and the loop of the noose was six (6) inches in diameter. Supervisor Jim Miraglia came up the line toward the noose and said, "Millie, what's the beef" and tried to take the noose apart by pulling, and Woody screamed at him two or three times to put it down. Miraglia then threw the noose on her work station. Woody put in a committeeman call and later filed a grievance over the matter. Plaintiff, who was on a medical leave of absence when the incident occurred, never saw the noose hanging in the plant. Rather, plaintiff saw the noose that Woody had in her hand when Woody was on her way to labor relations. Plaintiff was in the plant in order to visit the medical department when this occurred.

GM investigated the concerns raised by Woody and other employees, including plaintiff, regarding the noose, and determined that it had been made by Miraglia. Miraglia, who is originally from the east coast, explained that he was merely tying knots in a piece of material, and was unaware of the racial connotation associated with a noose. Despite GM's conclusion that Miraglia's action was not discriminatory, GM counseled Miraglia regarding the incident.

In March 1999, employees discovered another apparent noose in the plant. GM investigated the incident, and the hourly employee who hung the item asserted that he did so in response to the "Y2K" crisis, and also to express concerns that the union "ought to be hung" for failing to accomplish certain measures with regard to profit sharing. The employee who hung the noose was suspended for one week. Plaintiff did not see the second noose, and only heard about it from co-workers.

Several days later, GM discovered a length of rope in a material crib that had been detached from a spool and tied into a loop which appeared "noose-like." Plaintiff did not see this third item, and again only heard about it from co-workers. GM investigated the incident but was unable to determine who had produced the rope or what its purpose was. Other individuals complained of the multiple nooses found at General Motors in 1998 or 1999. In the summer of 1999, GM received six EEOC civil rights complaints.

Other than the noose incidents, plaintiff has never heard any member of GM management use a racial slur or make any other racially derogatory statement.

### 2. Allegations of Sexual Harassment Regarding Steve Clark

During 1996 and 1997, plaintiff worked in the plant's reliability department. Steve Clark was plaintiff's supervisor. During that time frame, plaintiff alleges that Clark made several comments to her that plaintiff contends constituted sexual harassment:

1. While plaintiff was jumping rope outside the plant during a break, Clark looked at her breasts and told her that he "love[d] to see [her] jump rope."

2. Following plaintiff's request to leave early from her scheduled shift, Clark said to plaintiff. "You are looking in my eyes and I can tell by your eyes that you want me."

3. During a power failure at the plant, Clark told plaintiff, "You know, you are becoming a real pain in my ass, that's a good pain."

4. During a discussion regarding plaintiff's assignment to a light duty position due to a medical restriction that precluded her from working overtime, Clark told plaintiff that he would "rather have [her] work eight hours [per day] than not at all."

Plaintiff reported the statements to Joelle Thomas, an African–American female who worked as the plant's Equal Employment Opportunity coordinator. GM management investigated plaintiff's complaint and was unable to establish that discriminatory conduct had occurred.

Approximately six months after the last of the four allegedly harassing comments, plaintiff observed Clark, without comment, place a styrofoam container with a piece of cake inside on her work station. At the same time, Clark gave a piece of the same cake to one of plaintiff's male co-workers who was standing nearby. Plaintiff reported the incident to plant manager Paul Marr, labor relations representative Pam Goodwin, and her union representative. In response to plaintiff's report, Marr met with Clark, and plaintiff had no problems with Clark thereafter.

### 3. The Security Incident

As set forth in more detail below, an incident, referred to herein as the "security incident," occurred on January 25, 1999. Plaintiff contends that the security incident was discriminatory. The incident involved primarily Cecil Oldham, who at the time was the plant's supervisor of hourly employment. Plaintiff asserts numerous facts which plaintiff sets forth under the heading "Additional Facts Leading up to

and Concerning the 'Security Incident.'" With respect to many of these facts alleged by plaintiff, the court is not clear how they are related to the security incident or how they are otherwise relevant to plaintiff's claims of discriminatory conduct. However, the court considers plaintiff's factual contentions in ruling on this motion.

**July 27, 1998**—While the plant was closed because of a strike, plaintiff broke her ankle. Dr. F.M. Gilhausen treated plaintiff and completed attending physician statements for plaintiff to remain on disability.

**October 16, 1998**—Dr. Gilhausen provided a note that stated plaintiff could return to work on October 19, 1998, to light duty if possible-no climbing stairs, excessive standing, or walking.

**October 19, 1998**—Plaintiff reported to work to the plant medical department with her restrictions. Plaintiff was wearing open-toed sandals. Earlene Webb, R.N., told plaintiff to go home and that she could not release plaintiff to return to work because she was wearing sandals. There is no dispute that employees are not allowed to wear open-toed shoes while working on the plant floor. The Return to Work form that was completed by the medical department states: [plaintiff was wearing] open-toed shoes & unable to fulfill restrictions. With respect to plaintiff's restrictions, Nurse Webb recorded that plaintiff needed to have specific limitations for her restriction and that, until plaintiff got her restrictions clarified, plaintiff was not going to be allowed to return to work. Plaintiff was not released to return to work that day.

**October 28, 1998**—Dr. Robert Rondinelli examined plaintiff, and in a letter to GM, stated plaintiff was not able to resume her work duties unaccommodated at this time. Rather, plaintiff could return to work only if she was not required to climb, could wear high-top shoes or boots for support, and could work four to six-hour shifts.

**November 2, 1998**—Dr. Gilhausen released plaintiff to work full duty pursuant to forms Dr. Gilhausen completed on October 27 and October 30, 1998. Plaintiff and Oldham met, at which time Oldham told plaintiff she needed to obtain a doctor's statement indicating what she was able and unable to do since Dr. Rondinelli and Dr. Gilhausen's statements were apparently conflicting.

**November 3, 1998**—Dr. Gilhausen issued a return to work slip that stated "[Plaintiff] can not return to her present job driving a forklift. She is able to return to full duty at her previous job. She is to limit her climbing stairs, standing long periods of time and excessive walking. Restrictions apply until next appointment on 11/17/98."

**November 4, 1998**—Plaintiff returned to work with Dr. Gilhausen's statement. Oldham requested from plaintiff that her doctor provide an end date for plaintiff's restrictions. Plaintiff was released to work at CTI[2] for one day. On the bottom of the Return to Work form, Margo Gambill, staff nurse, wrote that plaintiff was allowed to work one day until the restrictions have an end date.

**November 5, 1998**—Nurse Gambill completed an ADAPT form[3] that indicated plaintiff had provided Nurse Gambill with a proper Return to Work form from her doctor. The restrictions on the ADAPT

---

**2.** CTI is an outside plant where employees with impairments are usually placed.

**3.** "ADAPT" stands for Adapting People in Transition. Under the ADAPT program, employees who are returning to work from a worker's compensation injury with restrictions or from a personal non-job-related injury with restrictions are eligible for placement through the ADAPT program.

form were: limited standing, less than two hours per day, and no operating cranes or power vehicles.

**November 15, 1998**—Plaintiff documented in her notes [4] that she was called into the Material Department office by Glen Benedick, a trainer in material, to see Ken Cavanaugh, Mike Daniels and Tim Wells. They asked, "Do you feel comfortable on the forklift? We do not want you to pose any harm to yourself as well as to others." Plaintiff felt as though she was being cornered and badgered to the point that they wanted answers fast.

**November 15, 1998**—Dr. Gilhausen issued a Return to Work form that stated plaintiff's estimated return to work would be December 17, 1998. Plaintiff was placed at CTI through December 17, 1998.

**December 14, 1998**—Plaintiff documented in her notes that she spoke to Oldham about her benefits and he said this issue would be resolved Monday. The issue was apparently whether there was work available for plaintiff during October 19 through November 14 and, if there was, whether plaintiff would get paid sick leave.

**December 15, 1998**—Plaintiff documented in her notes that, when she arrived on Tuesday, Oldham made a phone call to a benefit representative in Detroit and told plaintiff that she should expect a letter of denial. Stan Berry threatened to call security on her. Oldham then asked plaintiff, "You want more time off?" Oldham then gave plaintiff a direct order to go to Labor Relations. He then called in Stan Berry, labor relations representative, who asked "Madella, are you on the clock? Who do you work for? Just have a seat." Berry asked "how have you been making it being on sick leave?" and "do you have homeowners insurance? Maybe you should tap that supply."

**January 4, 1999**—Plaintiff documented in her notes that she worked 8.8 hours that day and went to see Oldham, who said he was busy and she would have to see him some other time.

**January 5, 1999**—Plaintiff documented in her notes that she worked 2.0 hours, and then Oldham sent her home and refused to pay her. The court notes it is not clear from the record whether Oldham had the authority or responsibility to pay plaintiff.

The Return to Work form dated 01/05/99 from Dr. Gilhausen, stated it was his recommendation that plaintiff be moved to another department that could accommodate her restrictions—no getting off and on a forklift, no standing for long periods of time, and no stair climbing. Three days later, Dr. Gilhausen returned her to work full duty with no restrictions.

**January 15, 1999**—Plaintiff received $.46 in pay.

Plaintiff documented in her notes that, after the Martin Luther King celebration, she spoke with the plant manager Marr about her sick leave pay and her glasses. He asked who the two people were from management that were involved and plaintiff told him they were Oldham and Berry. Marr said he would get back with her on January 19.

**January 19, 1999**—Plaintiff documented in her notes that she was assigned permanently to W28 Trim Department, and sat there for 2 ½ hours.

**January 21, 1999**—Plaintiff documented in her notes that she observed two employees sweeping floors by column X26B while plaintiff claims she was told that she had too many restrictions.

**January 25, 1999**—Plaintiff went to Oldham's office, to discuss the status of cer-

---

4. Plaintiff testified that, during the course of her employment, she documented many of the

incidents about which she now complains at the time those events took place.

tain benefits information. When plaintiff entered Oldham's office, he was meeting with Tom Meier, the plant's supervisor of labor relations. Oldham asked plaintiff to leave, and indicated that if she did not do so, he would contact plant security. Rather than leave, plaintiff took a seat and demanded that Oldham immediately make a telephone call to determine the status of a "denial letter" plaintiff needed to appeal a decision regarding her benefits. Four to five members of the plant's security department then arrived at Oldham's office and reiterated the request that plaintiff leave, explaining to plaintiff that if she again failed to do so they would contact the local police department. The zone committee person Tom Kerr was called, and Kerr talked Oldham into making the call about the denial letter. Oldham made the call plaintiff had asked him to make, and she left his office and the plant on her own accord. At no time did any member of the security department touch plaintiff or escort her from the building. However, plaintiff believed that her life was threatened by the actions of GM management.

**January 26, 1999**—Oldham called the benefits department and stated that the claim should be paid.

**February 8, 1999**—Plaintiff documented in her notes that she was called into the office by supervisor Schmidt, who told her that she could not pull this job because other team members and leaders were complaining that they have to do all the work. Plaintiff passed through labor relations to see JD Hogan, and plaintiff contends Berry turned around and started to follow her. He stopped when she stopped.

**February 9, 1999**—Dr. Donald Knepper completed a Supplementary Report for

Sickness and Accident Benefits for plaintiff, stating that plaintiff was totally disabled from October 19 to November 4, 1998. Prior to this date, plaintiff's benefits had been denied because Oldham told the benefits department that there was a job available within restriction, but that plaintiff had to put closed-toe shoes on. Oldham spoke with the benefits department on February 9, which stated the PMD would now certify there was no job available within restrictions.

### 4. Towing Incident

On March 3, 1999, plaintiff walked outside to her car at lunch time and noticed a warning sticker on it that said she was illegally parked in the handicapped zone. Plaintiff did not move her car and, when she finished her shift, she discovered that her car had been towed. Plaintiff had a state handicap decal for handicap parking hanging in her car. At the time of the towing, plant policy required that, in addition to any state permit, an employee who wished to park in a designated handicapped space needed to obtain a separate permit issued by the plant. Plaintiff claims she was unaware of this policy. Plaintiff believes that the cars of five other employees were also towed from handicapped spaces that same evening, but she does not know the names of those individuals. Plaintiff does not know of any vehicle that was towed that had the required plant-issued permit, nor is she aware of any vehicle that did not have such a permit but was allowed to remain in a designated handicapped space on the night at issue.

Following plaintiff's complaints about the towing incident, GM reimbursed plaintiff for the costs associated with the towing,[5] and also amended its policy to elimi-

---

**5.** Plaintiff claims that, once she picked up her car, she noticed it had been ransacked. Plaintiff asserts that she drove out of the tow lot and noticed that her car sounded excep-

tionally loud and that the glove compartment had been tampered with. A Sony tape recorder and a small spiral notebook were missing. Plaintiff also asserts that she got an

nate the requirement for a plant-issued permit where an employee has a state handicapped parking permit. Although plaintiff initially testified that she did not know why a decision was made to have the cars towed, she later said she believed that Stan Berry ordered that her car be towed because he had just completed a disciplinary interview with plaintiff.

### 5. The Photograph Incident

Approximately five years ago, plaintiff was showing some co-workers a photograph of her goddaughter, who is white. In response to a question from Wayne Haddock, a co-worker, plaintiff said that the baby was her "granddaughter." In response, Haddock asked plaintiff, "What's the joke?" Haddock and another co-worker, Norman Breedlove, then looked at the picture, and Breedlove pointed to a small black patch on the photograph and said "if this is the picture of the grandbaby, I can't see anything here but the teeth." Breedlove then said, "Next thing, you'll be telling me this is a picture of your boyfriend. I can't see anything here but the teeth." Plaintiff reported Breedlove and Haddock's comments to her supervisor Steve Clark, but she is not aware of any action Clark took in response.

Plaintiff contends that, about a week later, Leonard Vansell, a business manager at the plant, said to plaintiff, "What's the matter with you, are you drunk?" Plaintiff contends others heard the comment. Vansell then assigned plaintiff to a job and told her that Haddock would show her how to perform it, but Haddock said "he didn't have to do a damn thing to show [plaintiff] anything." Plaintiff reported Haddock's use of profanity to Joelle Thom-

as and, to plaintiff's knowledge, no action was taken.

### 6. Glenn Matthews

One of plaintiff's co-workers, Glenn Matthews, at one point worked as plaintiff's "team leader." During the time he worked as plaintiff's team leader, Matthews indicated that he did not want to relieve plaintiff when she wanted to use the restroom or take other breaks. Plaintiff documented in her notes that, on February 18, 2000, Matthews said in a team meeting that he was running the meeting and did not have time to play games. Matthews told plaintiff that she could not write down comments and said his job was for emergency relief only. Matthews said he knew something was not right if a person continues to go to the restroom on schedule every night. At 11:05, plaintiff pulled the cord for a restroom break. Matthews did not answer, and the cord stayed on for 17 minutes.

After Matthews transferred to another position, where he worked in close proximity to plaintiff, he frequently smoked a cigar when walking through the plant. Plaintiff, who has bronchitis, asked Matthews not to smoke around her. Matthews told plaintiff that he would "smoke his cigar whenever he got damn good and ready," and called plaintiff a "lame bitch." Plaintiff raised complaints about Matthews's cigar smoking to GM management, and was told that plant rules allow Matthews to smoke throughout the facility. Management suggested plaintiff obtain a doctor's excuse to allow her to avoid working around smoke. On March 8, 2000, plaintiff filed a police report regarding Matthews smoking a cigar in her face,

---

estimate for damages to her car. They put her car on the rack and noticed a crack in the exhaust, power steering had leaked out, and blue washer fluid had been added. GM

points out that plaintiff has failed to establish that GM caused or was responsible for any alleged damages to her car.

refusing to leave, and then threatening her. She also completed a "Threats or Acts of Violence" form from GM.

Regarding Glenn Mathews, plaintiff also contends:

**June 9, 2000**—Plaintiff documented in her notes that Matthews was at the line where plaintiff worked, apparently to visit co-worker Jerry S. Plaintiff asserts there was no reason for Matthews's visit.

**June 30, 2000**—Plaintiff documented in her notes that Matthews came into her work area, lit a cigar, blew smoke, and stayed for ten minutes. GM points out that plant rules allow Matthews to smoke throughout the facility.

**July 31, 2000**—Plaintiff documented in her notes that Matthews was in her work area with a cigar lit.

**June 6, 2000**—Plaintiff documented in her notes that, when Matthews came to the line, he looked at a book, got peanuts, and then laughed when plaintiff mentioned him to supervisor Minnefield.

**July 20, 2000**—Labor relations representative Pamela Goodwin called plaintiff into a meeting to speak with plaintiff about her disputes with Matthews. Goodwin informed plaintiff that Matthews had complained about her. Plaintiff walked out on the discussion to "enjoy [her] break." Plaintiff believes Goodwin, who is also African–American, was speaking with her in retaliation for plaintiff's calls to the GM Aware line.[6]

**July 21, 2000**—Plaintiff met with her union representative, Sonny Lyman, regarding Matthews. Plaintiff claims that she was escorted to labor relations by security guards at the plant and put in a conference room with Lyman and Dee Andrews. During the meeting, Lyman said

"any more problems in your department between you and Glenn Matthews and I will split you both up." Lyman asked Dee to make a note that plaintiff would not talk and that Lyman was supposed to counsel plaintiff anytime she refuse a direct order.

**July 31, 2000**—Plaintiff documented in her notes that Matthews was in her work area with a cigar lit.

**February 5, 2001**—Plaintiff documented in her notes that Matthews expelled gas in two car jobs.

Plaintiff raised complaints about Matthews to GM. Matthews also apparently complained about plaintiff, alleging that when he served as her team leader she took excessive breaks and was now attempting to "cause trouble" and get him suspended.

### 7. Other GM Employees

Juanita Williams, a black female, has been employed by GM for 30 years. Williams claims she was treated differently than other team leaders. Williams also contends that provisions were made for temporary employees, who are not regular GM employees and have no seniority, to work overtime. However, Williams offers no information regarding the period of time she was treated differently, who treated her differently, and the race, gender, or age of any other employee allegedly treated more favorably.

Mildred Woody was employed by GM for 29 years before she retired in 2000. Woody contends that during the time she was employed at GM, it was common knowledge that the supervisors and management stuck together and defended each other. Woody also asserts that supervisor

---

**6.** GM has a 1–800–AWARE Hotline for employees to confidentially report events at work. When the Personnel Director at GM receives a GM Aware line report and a re-

quest for investigation, if the complaint is from an hourly employee, it would be sent to labor relations, and one of the labor representatives would investigate the complaint.

Valerie Lussier and Jim Miraglia treated black women differently, in that they nit-picked black women and they subjected black women to greater scrutiny of their work. Woody also complains of an instance in 1998 when Lussier refused to give Woody a hospital pass and in 1999 when Woody pulled the cord and no one responded.

Jacqueline Carter is a black female who was employed by GM beginning in 1973. Carter claims that Lussier tried to get Carter to quit by monitoring her work, repeatedly calling Carter into the office to criticize her, and threatening Carter with write-ups. Carter also contends that Lussier repeatedly asked Carter when she was going to retire or why she didn't retire and that Lussier told two fellow employees that Carter should retire. Carter asserts that Lussier certified black women more frequently than others. With respect to alleged favorable treatment of other employees, Carter claims that two white women, Judy Roberts and Joanne Arbington, were not disciplined after popping rubberbands at men and talking all night long; a white female, Peggy Peterson, was not hassled after returning to work from surgery; a male co-worker, Paul Grice, was off work much of the time and never learned his job, but was never criticized by the supervisors; a male employee, Ron Lewis, missed checking numerous items on the cars and would have cars "shipped" with things wrong, but was not called into the office or written up. However, the record establishes that Grice received several written notices from supervisors regarding absences and careless workmanship, and Lewis was certified, counseled, and written up numerous times for careless workmanship or for failing to do his job properly. Carter filed a charge with the Kansas Human Rights Commission, wherein she alleged that she was not accommodated and forced into retirement because of her race, age, and disability.

The court notes that Williams, Woody, and Carter each allege that they were denied certain job positions based on their race, age, or gender. The court omits their allegations, however, because none of the three identify with any specificity the positions for which they applied, nor do they identify any other employee who purportedly received such positions. More significantly, the court concludes that these allegations have no bearing on plaintiff's claims because plaintiff does not contend that she applied for and was denied a particular position based on her age, race, or gender. With respect to any argument that these allegations support plaintiff's hostile work environment claim, the court further points out that plaintiff has not established that she was aware of the alleged improper conduct at the time plaintiff was herself allegedly subject to a hostile work environment. *See Discussion, infra,* Section III.B.1.

## B. Facts Relating to Plaintiff's ADA Claim

### 1. GM's Medical Department

Dr. Donald Knepper, D.O. is an occupational physician for GM who is in charge of the medical department. Margo Gambill has been a staff nurse at GM and is supervised by Dr. Knepper. Part of Gambill's job as a nurse in the medical department was to receive forms claiming work-related injuries. Gambill was not aware of a grievance that plaintiff had filed against the medical department—she was never asked any questions about the grievance and was never interviewed.

Return to Work forms are used when an employee has been off work and is trying to get back to work. Those forms are first completed by the labor relations department and then they are processed in the medical department. A Fairfax medical pass is used for an employee who is al-

ready at work and needs to go to medical for some issue. Those passes are initiated on the floor.

Dr. Knepper's responsibilities with regard to the ADAPT program are restrictions, whether or not he can fulfill those restrictions on the floor. The medical department at GM does not treat any employee's personal medical conditions that are non-job related. In order to utilize the ADAPT program, the employee must first bring their doctor's restrictions to one of the plant nurses. After conducting a fitness for duty examination, the nurse makes a determination whether the doctor's restrictions should be honored. For the restrictions to be appropriate, the note from the employee's doctor must have a diagnosis or reason for the restrictions, a beginning date, and end date. The nurses are allowed to exercise their discretion in making the determination of whether the restriction should be honored. If the nurse does not agree with the restrictions, the employee is placed back on sick leave and is sent back to their doctor to get the note clarified.

If the nurse agrees with the restrictions, an ADAPT person, either Joe Biondi or Navita Johnson, presents the restrictions to the manpower committee on the floor, who then determines the job placement. If a person is unable to be placed on job through ADAPT, that employee would go back on sick leave. Employees with permanent medical conditions who can be placed in a job within their restrictions are returned to work for six months, and then they have to update their restrictions.

### 2. Plaintiff's Impairments

Dr. Knepper[7] is aware of physical impairments to plaintiff's back, neck, and shoulders that Dr. Gordon Thorn, D.O.,

evaluated for GM. Dr. Thorn also advised Dr. Knepper on February 19, 1998 that plaintiff had right carpal tunnel syndrome. Dr. Knepper is aware that plaintiff suffered a cervical strain and shoulder strain in April 1998, which GM accommodated for a period of time, and that plaintiff had shoulder problems while working at GM, which GM also accommodated at one time. Dr. Knepper also has knowledge that plaintiff suffered an ankle injury.

Notwithstanding plaintiff's impairments, plaintiff lives alone in a home which she maintains and cleans herself. In addition to washing dishes, vacuuming, dusting and scrubbing her bathrooms on a weekly basis, plaintiff mows, weeds, and rakes her own lawn. Plaintiff also plants a garden every year and performs other landscaping activities. Plaintiff cooks at least one meal for herself on a daily basis. Plaintiff also drives her personal vehicle daily, and pumps her own gas.

For the past two years, plaintiff has owned three dogs that she takes care of by walking, feeding, grooming, and cleaning up after them. As recently as two years ago, plaintiff had six Saint Bernards, all of which she also took care of by herself. Plaintiff cares for some of her grandchildren, who range in age from five to nine, overnight in her home, and also provides regular transportation for her mother.

### 3. Facts Plaintiff Alleges Constitute Disability Discrimination

On August 20, 1996, and again on October 7, 1996, plaintiff was hit from behind by a car that was being loaded on the line because the person that was loading the line left the car in drive. Plaintiff does not contend that these incidents were purposeful. On November 4, 1996, plaintiff re-

---

7. Knepper is designated the person with the most knowledge at GM of plaintiff's com-

plaints, injuries, and medical conditions.

ceived a medical pass for her sore neck and shoulder from Nurse Gambill that stated "Let employee use a chair to do her job." The next day, Steve Clark issued and signed a medical pass that stated, "No need for a chair."

**April 14, 1997**—Plaintiff presented a Return to Work form signed by Dr. Waxman restricting her to working an eight-hour shift. Plaintiff was released for limited duty.

**December 11, 1997**—Plaintiff received a medical pass from Jim Miraglia to go to medical for pain in her shoulder. Plaintiff documented in her notes that, the following day, Miraglia singled out plaintiff and asked why she skipped a car. She stated that she did not skip any car. He said he counted every fifth car and plaintiff's punch should have been on it. Plaintiff told Miraglia he should have asked all of the other team members, but he did not. Plaintiff told Miraglia he owed her an apology. Miraglia said he did not. Plaintiff claims she was certified that night in retaliation.

Plaintiff was suspended for the balance of her shift and two weeks for using abusive language toward Miraglia and refusing to accompany Miraglia to the labor relations department. Ten days after the discipline was issued, it was removed from plaintiff's record as a result of a grievance filed by plaintiff. Plaintiff does not recall whether she served the entire two weeks of the suspension, or whether she received any back pay for the time she was off.

**February 6, 1998**—Plaintiff received a medical pass for a sore shoulder at 4:50 p.m. Supervisor Valerie Lussier called the medical department to check on plaintiff at 5:25 p.m.

**March 27, 1998**—For the third time, plaintiff was hit by a car from behind the car she was working on at her work station and sustained injury. Plaintiff does not contend that these incidents were purposeful.

**March 30, 1998**—Plaintiff received a medical pass from Lussier for a headache. Plaintiff went to medical and on the form, Nurse Gambill wrote, "no overhead reaching or bending to reach under dash. Return to restricted job for tonight. To see doctor tomorrow."

**March 31, 1998**—Plaintiff's chiropractor, Michael V. Merritt, D.C., wrote a letter advising GM that plaintiff should avoid work duties on March 31, 1998 and April 1, 1998. Nurse Gambill excused plaintiff from work even though it is the policy of the medical department to not honor restrictions from a chiropractor.

**April 2, 1998**—Plaintiff was sent to work with the restrictions of limited reaching with arms. Nurse Gambill completed the medical notice of restrictions for this ADAPT placement for plaintiff.

**April 29, 1998**—Robert Allen, D.C., released plaintiff to light duty, no lifting over five pounds, no sudden movements, and no bending, through May 8, 1998.

**April 30, 1998**—Dr. Thorn recommended to continue light duty status until reevaluation in three weeks. Nurse Gambill needed more clarification on this restriction because she did not know what "light duty" meant. Nurse Gambill noted "no lifting over 20 lbs per Dr. Thorn" on the Medical Notice of Restrictions, and plaintiff was returned to her department under Steve Clark.

Nurse Gambill would not sign the ADAPT form to send plaintiff to a different department because Gambill felt plaintiff could do her regular job, notwithstanding that the Union and the ADAPT representative disagreed with Gambill. Supervisor Steve Clark told Gambill that plaintiff did not lift over 20 pounds in her regular job.

That same day, Jim Miraglia questioned plaintiff as to why it was taking so long to get through medical. Plaintiff apparently had been counseled already that same day for loitering to and from the medical department. Miraglia asked plaintiff where her medical pass was, to which plaintiff replied by shrugging her shoulders. After asking plaintiff five times where her medical pass was, plaintiff threw it on the floor at Miraglia's feet. Miraglia indicated in his notes that, later that day, plaintiff failed to check the turn signals on a vehicle. When questioned about it, plaintiff told Miraglia, "You check them, then."

**May 1, 1998**—Plaintiff's chiropractor, Dr. Allen, recommended plaintiff be off work until May 4, 1998, due to severe muscle spasm and edema. That day, Steve Clark placed plaintiff at CTI. However, plaintiff admits that GM's medical department is not obligated to follow restrictions imposed by chiropractors, and plaintiff has not demonstrated that this practice was not followed with regard to all employees.

**May 4, 1998**—Plaintiff received a medical pass for neck and shoulder pain. Plaintiff reported to medical and asked for something for the pain in her shoulder and neck. Nurse Gambill documented as her objective assessment that plaintiff was moving her head with conversation and when she signed in.

**May 5, 1998**—Plaintiff provided the medical department with a Return to Work form from her physician, Cedric Fortune, M.D., dated May 5, 1998, which released her on May 11, 1998.

**May 11, 1998**—Dr. Thorn released plaintiff to return to work with the restriction of no lifting over 20 pounds, and plaintiff received a Return to Work form from GM on May 11, 1998. That day, Miraglia came down the line to see if plaintiff had a form for him. Miraglia said "Where is it—does Medical Department have it?" Plain-

tiff contends Miraglia used an unprofessional manner when addressing her.

### 4. Facts Plaintiff Alleges Constitute Harassment Regarding Her Medical Restrictions

**February 10, 1999**—Plaintiff's chiropractor, Dr. Allen, completed an Authorization for Absence form, which stated that plaintiff was excused from February 10, 1999 to February 12, 1999. It also stated: "Please, in order to aid her healing, [plaintiff] needs to have a lifting restriction to under 25 pounds and no lifting and twisting at the same time." At the bottom of the form, it stated: "Restrictions not honored by medical from chiropractor. RTW."—C. Cassidy, RN.

**February 19, 1999**—Dr. Gilhausen prepared a note that suggested plaintiff remain off forklift duty another three weeks, through March 12. Plaintiff documented in her notes that, when she arrived at work, medical said her supervisor called and said he didn't have any work she could do. Stan Berry then came into medical and asked plaintiff if she was refusing to do her job. After Berry and Gary Shaw interviewed plaintiff, she returned to try to operate the tugger at work. On that same day, plaintiff received a medical pass documenting her swollen ankle and was returned to work.

**February 22, 1999**—Plaintiff documented that she had an appointment to see Dr. Jane Rathbun, but the doctor was out sick. The next day, plaintiff waited all day to see Dr. Rathbun. Supervisor Vince Schmidt told plaintiff that he did not have anyone to replace her so that she could see Dr. Rathbun.

Nurse Gambill received plaintiff's February 19, 1999 claim for workers' compensation for re-injury to right broken ankle. Plaintiff made another claim for workers' compensation on February 19, 1999 for

"lifting restrictions to under 25 pounds—reinjury."

**February 25, 1999**—Plaintiff received a medical pass for joint soreness ankles, etc. Plaintiff was returned to work and had an appointment with Dr. Rathbun on March 1, 1999.

**March 1, 1999**—Plaintiff received a medical pass for a swollen right ankle and sore neck/shoulders and saw Dr. Rathbun. Plaintiff received another medical pass later that evening for ice right ankle.

**March 2, 1999**—Plaintiff got a medical pass to discuss her shoulder and ankle issues and another pass for sore ankle, neck and shoulders. Plaintiff was returned to work with the comment written on the pass: Personal problem, no restrictions, no injury or illness found. The pass was signed by Dr. Rathbun.

Plaintiff documented in her notes that the doctor said that, because her ankle injury occurred over a year ago and had healed satisfactorily, plaintiff did not have a medical problem, had no restrictions, and that the medical department would not treat her for this problem again.

**March 3, 1999**—Plaintiff documented in her notes that she asked for a medical pass from supervisor Schmidt, and he said he had to call labor relations first because they said plaintiff was going down to medical too much. Plaintiff got the pass and went to medical. The nurses refused to treat plaintiff at first, but then treated plaintiff after the nurses measured plaintiff's ankle and concluded the ankle had swollen.

**March 4, 1999**—Plaintiff documented in her notes that Schmidt was "bird dogging" plaintiff when he put her on a job and got her to do special jobs. Plaintiff does not specify what "special jobs" to which she was referring.

**April 14, 1999**—Plaintiff's psychiatrist, Dr. John Henderson, completed a medical form for sickness benefits that disabled plaintiff from work from March 30 until April 19, 1999 because of generalized anxiety disorder. Dr. Henderson completed supplementary reports extending plaintiff's disability until October 24, 1999.

**October 22, 1999**—Dr. Henderson released plaintiff to return to work on October 25, 1999, with no restrictions.

**October 29, 1999**—Plaintiff received a medical pass for neck and shoulder pain. Plaintiff was returned to work with no restrictions.

Dr. Knepper received a fax enclosing plaintiff's IME report from Dr. Darnell, who stated plaintiff should not be required to work with her cervical spine in an extended position, nor should she be required to work overhead. Plaintiff asserts that the medical department refused to honor her permanent medical restrictions and that, specifically, Dr. Knepper refused to honor the restriction of no extended bending of the neck because he could not get anyone to tell him what extended bending of the neck meant. The court notes that it is apparent from the record that Dr. Knepper was not aware of what Dr. Darnell meant by "extended bending of the neck," and plaintiff does not point to any efforts she made to clarify the nature and extent of this restriction. In any event, plaintiff has not alleged that she was required to perform any work that required extended bending of the neck or suffered any injury or other damages as a result. Moreover, plaintiff has acknowledged that the plant medical department generally does not honor restrictions that are deemed "permanent," and plaintiff has failed to allege or demonstrate that this practice was applied in a disparately discriminatory or otherwise improper manner.

**November 5, 1999**—Plaintiff received a medical pass indicating she was in a car

struck from the rear. Plaintiff was returned to work.

**November 19, 1999**—Dr. Henderson wrote a note that plaintiff was "advised to remain out of work until 12/6/99."

**December 6, 1999**—Plaintiff received her Fairfax Plant Return to Work form allowing her to return to full duty.

**December 9, 1999**—Dr. Henderson completed a disability benefits form and disabled plaintiff from work because of generalized anxiety disorder. Dr. Henderson noted, "Employee reports harassment on the job, creating stress."

**December 10, 1999**—Plaintiff received a medical pass for a stiff neck and was returned to work.

**February 12, 2000**—Dr. Henderson examined plaintiff in the office and found her to be unable to work due to anxiety and tension headache. Dr. Henderson released plaintiff to return to work on February 19, 2002. In Dr. Henderson's note, he stated plaintiff had been treated with psychotherapy and tranquilizers.

**February 25, 2000**—Plaintiff went to the medical department complaining of a headache.

**March 23, 2000**—Dr. Henderson completed a claim for sickness and accident benefits that disabled plaintiff from work from March 13 to April 10, 2000. Plaintiff points out that this followed Glenn Matthews's threat that plaintiff reported to the police. However, plaintiff has failed to cite to any evidence to suggest that her health care provider substantively linked the leave of absence to the alleged threat by Matthews.

**April 18, 2000**—Plaintiff was supposed to return to work after being released by Dr. Henderson. Plaintiff documented in her notes that the medical department refused to let her return to work until the department talked to Dr. Henderson about the medications plaintiff was taking.

Plaintiff was allowed to return to work on May 1, 2000.

**May 1, 2000**—Plaintiff documented in her notes that, when she arrived at work, nurse Tammy Brotherton gave her a smug look in the parking lot.

**September 1, 2000**—An Employee Statement of Injury was completed for plaintiff when she complained of sharp pains in her neck and shoulder when reaching down to pull a seat release.

**September 5, 2000**—Dr. Henderson stated in a note that "[plaintiff] is unable to work today and is being advised to remain off work until the disability is removed." Plaintiff was released to return to work on September 8, 2000.

**November 9, 2000**—Plaintiff filed a claim for workers' compensation for repetitive trauma. That same day, plaintiff received a medical pass for a sore neck and was returned to work.

**March 29, 2001**—Plaintiff received a medical pass for pain in her neck and arm and was returned to work.

**April 12, 2001**—Plaintiff suffered a mishap and her right hand and shoulder were swollen. After receiving treatment in the medical department, plaintiff claims she was accused of refusing to let the nurse look at her shoulder. The court notes that plaintiff never denies refusing to let the nurse look at her shoulder.

**April 17, 2001**—Plaintiff felt a pop in right shoulder at work and went to medical. Plaintiff filed a claim for workers' compensation for this injury.

**May 16, 2001**—Plaintiff was on disability until May 2002. During this period of time, plaintiff was treated by the following physicians:

a. Cedric Fortune, M.D., disabled plaintiff from work because of her rotator cuff syndrome.

b. Stephen W. Munns, M.D., evaluated plaintiff June 29, 2001, for a right shoulder tear and possible left knee tear; on August 3, 2001, for a right rotator cuff tear and left medial compartment DJD, recommending sedentary, full-time sit down work, no lifting her right arm over 10–15 pounds.

c. Dennison Hamilton, M.D., provided return to work recommendations for plaintiff's right shoulder tendinitis, rotator cuff, and left knee DJD, with restrictions on September 21, 2001, and permanent restrictions for her to return to work on October 31, 2001.

**August 13, 2001**—Plaintiff was seen by the medical department and was ultimately deferred until May 31, 2002. If an employee has a permanent restriction, Nurse Gambill generally defers them for six-month periods.

**November 1, 2001**—Medical department notes report that plaintiff had permanent restrictions of no overhead work, no pushing or pulling, and no lifting over 50 pounds.

**May 8, 2002**—Steven W. Munns, M.D., gave plaintiff permanent restrictions for her right rotator cuff tendinopathy of no overhead lifting, no regular lifting above waist, and no lifting over 20 pounds.

**May 28, 2002**—Plaintiff was released to work limited duty and placed at her same former reliability job through the ADAPT program, with the restrictions of no overhead lifting and no regular lifting of over 20 pounds above waist level.

### Sieg Siegele Incident [8]

Plaintiff contends that Sieg Siegele, a general supervisor in the reliability department, discriminated against and harassed her by giving her a choice on one occasion between performing her job and seeking outside medical attention. Earlier that same day, plaintiff had gone to the plant medical department complaining of pain and swelling in her arm, hand and shoulder. A plant nurse examined plaintiff, and apparently determined that she could return to work. Siegele based his directive that plaintiff return to work or seek outside medical attention on the information he had received from the nurse.

### C. Allegations of Age Discrimination

Plaintiff cannot recall any comment made by a member of GM management related to plaintiff's age. Plaintiff testified that some of her co-workers had made age-related comments, but plaintiff did not identify those employees, nor did plaintiff state what the comments were or when the comments were made. Plaintiff also contends that GM is hiring younger employees and "trying to push out" older employees. In support of this allegation, plaintiff asserts that employees at the Fairfax plant are arranging for their children and other relatives to be hired in place of older employees.

### D. Additional Facts Plaintiff Alleges Constitute Discriminatory Conduct

The facts in this section do not themselves necessarily manifest the type of discriminatory conduct about which plaintiff complains. The court will therefore merely set forth plaintiff's factual contentions in chronological order without attempting to categorize the alleged discriminatory conduct.

**January 29, 1997**—Plaintiff documented in her notes that she put in a call for her committeeman because there was an excessive fume buildup in her area. She pulled the cord to stop the line. Supervisor Al Milan said he had a problem with plaintiff.

---

8. The record is not clear when this incident took place.

**April 4, 1997**—Plaintiff was suspended for the balance of her shift and three days for leaving the line without permission. Leaving the line without permission is prohibited by a plant rule of which plaintiff was aware. Supervisor Milan later told plaintiff that she had been suspended because she failed to remain on the line until being relieved by another employee.

At the time of her suspension, plaintiff had a restriction from her personal physician limiting her to eight hours of work per day, which she had given to her union representative. Plaintiff claims that she showed the doctor's statement to Milan before the start of the shift and that he did not take the doctor's statement. However, during the disciplinary interview prior to the suspension, plaintiff was unable to show management a copy of the doctor's note regarding the restriction because her union representative had apparently lost it. Although plaintiff brought an additional copy of the note to work the following day, she gave a copy only to her union representative.

Plaintiff believes Milan suspended her in retaliation for "various issues," including her complaints regarding supervisor Steve Clark. Although Milan never made any references to plaintiff's allegations against Clark, plaintiff believes he was familiar with them because "[a]ll supervisors are familiar with other supervisors." Plaintiff believes that a white male employee, Wayne Haddock, left the line without permission, and was not disciplined for doing so. Plaintiff bases this belief on an incident one evening when she observed supervisor Milan looking for Haddock and apparently was unable to find him.

The disciplinary action from April 4, 1997, was removed from plaintiff's record [9] on December 22, 1997, after she had already been disciplined for the balance of her shift and two weeks.

**April 14, 1997**—Plaintiff documented in her notes that Milan said she was responsible for wipers and "Wimpy," a fellow coworker,[10] wrote up every last car on which plaintiff worked.

**April 15, 1997**—Plaintiff documented in her notes that, when team leader Billy Bob Butler was going down the line to electrical, Milan yelled at plaintiff. Later that day, supervisor Leonard Vansell was looking for Wayne Haddock, a white male coworker, who disappeared after lunch, and plaintiff did the job alone.

**April 16, 1997**—Plaintiff documented in her notes that she was called into the office to talk to Milan and committeeman Gary Cramer, and was told she had one day to learn the job—"no more bullshitting."

**April 17, 1997**—Plaintiff documented in her notes that supervisors Milan and Vansell were standing by the team room watching plaintiff work. A few minutes later, supervisor Steve Clark joined them. Later that evening, Milan stood and watched plaintiff while he was talking with Haddock.

**April 21, 1997**—Plaintiff documented in her notes that Wayne Haddock, who was the acting pool person at the time, relieved two people at station 1, two people at station 2 and then went to station 3 for relief and skipped plaintiff.

**April 26, 1997**—Plaintiff documented in her notes that plaintiff had been on sick

---

**9.** If a settlement of a grievance includes removal of the discipline, then the penalty is not utilized to determine the extent of the next imposition of discipline for progressive discipline after settlement.

**10.** Plaintiff alleges in her response brief that "Wimpy" is a white male. However, the portion of the record to which plaintiff cites does not support that factual contention.

leave prior to being laid off balance of shift and three days. During her leave, she learned that her co-workers had been working every Saturday starting at 4:00 instead of 4:30, and she was not informed of this at the time. Plaintiff spoke with Milan and stated she wanted to get paid. Milan said to file a grievance because he was not going to pay her and then accused her of not doing her job.[11]

**June 2, 1997**—Plaintiff documented in her notes that, when supervisors Herdman and Milan switched shifts, Wayne Haddock started working overtime as soon as Herdman came on the night shift. Plaintiff wrote in her notes that Herdman showed nothing but favoritism toward the white male workers.

**June 9, 1997**—Plaintiff documented in her notes that supervisor Herdman whispered in co-worker Art Ross's ear that Ross would work in audit until plaintiff left to go home, and then Ross would come back to replace her.

**June 10, 1997**—Plaintiff documented in her notes that, when she asked Herdman if she could work in audit, Herdman responded that there was not enough manpower for her to go to audit.

**June 12, 1997**—Plaintiff documented in her notes that Herdman walked down the line and asked co-worker Art Ross to work audit.

**June 19, 1997**—Plaintiff documented in her notes that plaintiff could not get training for audit but arrangements were made for Haddock to work in audit.

**June 20, 1997**—Plaintiff documented in her notes that Art Ross was called to audit, two people from the body shop came to replace Ross and Steve Abbington, and plaintiff remained on the same operation.

**August 1, 1997**—Plaintiff documented in her notes that Haddock went home after eight hours. Plaintiff claims that Herdman was looking for Haddock and never found him.

**August 6, 1997**—Plaintiff documented in her notes that Haddock was not disciplined for leaving shift after eight hours, but was now team leader.

**August 11, 1997**—Plaintiff documented in her notes that co-worker Billy Bob Butler came back after an illness and left in eight hours.

**September 8, 1997**—Miraglia counseled plaintiff on an alleged discrepancy. Plaintiff does not assert that the counseling was not warranted.

**September 24, 1997**—Miraglia counseled plaintiff for being late. Miraglia told plaintiff that she was due for balance of shift plus one week, but that he was going to forego the discipline in favor of counseling. Plaintiff does not assert that the counseling was not warranted.

**October 29, 1997**—Plaintiff documented in her notes that Herdman said, "I really like your hair today. But I really shouldn't have said that because I wouldn't want you to write me up for sexual harassment."

**November 30, 1997**—Plaintiff documented in her notes that Haddock falsely accused plaintiff of slamming a door in his face.

**December 11, 1997**—Plaintiff was suspended for the balance of her shift and two weeks for using abusive language toward Miraglia and refusing to accompany Miraglia to the labor relations department. Plaintiff was escorted to labor relations.

---

**11.** The court is unclear as to what plaintiff is contending. It appears she is asserting that she was entitled to additional compensation during a period of time when she was out of the plant on sick leave.

**December 12, 1997**—Plaintiff documented in her notes that Miraglia did not ask Larry Caldwell why he was late, or ask Dave Robinson why he was late on two days.

**May 4, 1998**—Plaintiff received counseling by Miraglia. Plaintiff does not assert that the counseling was not warranted.

**May 11, 1998**—Plaintiff received counseling by Miraglia. Plaintiff does not assert that the counseling was not warranted.

**May 12, 1998**—Plaintiff documented in her notes that Miraglia said he needed to certify plaintiff because she did not half check a car.

**May 12, 1998**—Plaintiff was suspended for the balance of her shift and three days for refusing or failing to do her job. Plaintiff does not recall who issued the discipline or the circumstances surrounding it. The discipline was removed from plaintiff's record in August 1998 as a result of a grievance filed by plaintiff.

**May 13, 1998**—Plaintiff documented in her notes that Miraglia called security to escort her to labor relations after plaintiff went to the medical department to use the restroom. Stan Berry, four security guards, and Miraglia waited outside. Berry said that plaintiff did not get permission to use the restroom, told plaintiff to have a seat in the office, and then slammed the door. GM controverts this fact by pointing out that plaintiff testified in her deposition she was suspended on May 12, 1998, and therefore could not have been subject to any alleged harassment in the workplace on May 13.

**May 15, 1998**—Plaintiff documented in her notes that Art Ross did not report to work and plaintiff claims no one asked for a statement.

**May 20, 1998**—Plaintiff documented in her notes that Ron Lewis arrived late for work and that nothing was said.

**June 1, 1998**—Plaintiff was transferred to the Material department.

**February 24, 1999**—Plaintiff documented in her notes that Joelle Thomas called and said it was impossible to set up any kind of meeting with plaintiff today or tomorrow. Plaintiff contends that "curiously," at 5:09 p.m., plaintiff saw Vansell and Clark laughing and talking with Thomas.

**February 25, 1999**—Plaintiff documented in her notes that, when she called Thomas and asked her to put in writing what Thomas had .said the day before, Thomas refused and asked if plaintiff was going to get an attorney.

**March 5, 1999**—Plaintiff documented in her notes that, the day after she learned about the second noose found at the plant, she called Thomas, who said she would not respond to any individual complaints in writing but that she would respond to an agency such as the EEOC.

**August 20, 1999**—Plaintiff called the GM Aware Hotline.

**January 1, 2000**—Plaintiff documented in her notes that supervisor Clark took supervisor Siegele's place since Siegele hurt his knee playing soccer. Clark was talking to co-worker Rambo while leaning over the rail between their work stations for ten minutes.

**January 10, 2000**—Plaintiff called the GM Aware Hotline and complained of discrimination.

**January 11, 2000**—Plaintiff documented in her notes that co-worker Jack Betts was transferred to salvage after he hurt his foot on a park brake.

**February 2000**—Plaintiff claims she was told she could not work outside of her "footprint," an area designated by lines on the floor. Plaintiff asserts that everyone works outside their footprint when they

are trying to keep up or get ahead on their work on the line. Plaintiff complained to the plant manager about differential treatment.

**February 17, 2000**—Plaintiff received a Notice of Disciplinary Action for allegedly "using abusive language." Plaintiff does not assert that the discipline was not warranted.

**May 1, 2000**—Plaintiff called the GM Aware Hotline.

**May 1, 2000**—Plaintiff and Beverly Williams called the GM Aware Hotline.

**May 15, 2000**—Plaintiff documented in her notes that she was interviewed by Towanna Frazier from labor relations about an incident involving co-worker Linda Kindred.

**May 15, 2000**—Plaintiff called the GM Aware Hotline complaining about Steve Clark, Glen Matthews, and Linda Geronimo.

**May 18, 2000**—Plaintiff documented in her notes that she filed a 6A grievance for harassment for singling her out with regard to the incident involving Linda Kindred.

**July 16, 2000**—Plaintiff filed a claim for workers' compensation for "irritation, angry and severe stress" arising on July 20 and 21, 2000. GM points out that plaintiff dated her claim July 16, 2000, but stated in her claim that she did not suffer the injuries until July 20 and 21, 2000.

**August 24, 2000**—Plaintiff called the GM Aware Hotline.

**September 1, 2000**—Plaintiff documented in her notes that at the last break, co-worker Rambo came to her work station and sat in a chair over plaintiff's purse and lunch. Plaintiff removed her belongings from her work station and returned to a car on the line. Plaintiff contends she started having an anxiety attack.

**January 8, 2001**—Plaintiff documented in her notes that union servicing representative Wilbur Neal returned her call regarding her unemployment payments that she had not received since being laid off on December 15, 2000. Plaintiff claims her co-workers had all started receiving their benefits before Christmas. Plaintiff told Neal that it would be nice if her union brothers could reimburse her. Plaintiff asserts that Neal said, "don't be calling setting my new year off wrong."

**February 6, 2001**—Plaintiff received a Notice of Disciplinary Action for failure to do the electrical check on job 1445338. A few days later, plaintiff filed Grievance 706260.

**February 7, 2001**—Plaintiff documented in her notes that she pulled the cord to tell Billy Bob to smell the car that Glenn Matthews had just gotten out of, and Billy Bob refused.

**March 20, 2001**—Dr. Gregory A. Ator, M.D., wrote a letter to GM medical department about plaintiff's allergy problem and recommending she avoid exposure to second-hand smoke, particularly cigars.

**May 9, 2001**—Plaintiff documented in her notes that Floyd Mayes, a white male co-worker, let a car pass without checking it. Plaintiff claims nothing was done. The next night, supervisor McAndrews accused plaintiff of shipping two cars unchecked.

**May 14, 2001**—Plaintiff documented in her notes that Floyd Mayes was acting team leader, and he accused plaintiff of not checking a car. Clem H, supervisor in the training department, said plaintiff missed one.

**May 16, 2001**—Plaintiff documented in her notes that she pointed out to Rick McAndrews, Clem H., and Sieg Siegele that Jack Betts was the one who tagged

the cars that they accused her of missing but that they didn't say anything to Betts.

### Linda Kindred Incident [12]

On one occasion, Linda Kindred, another hourly employee, placed various items on a table where plaintiff was working. Plaintiff suggested Kindred move to a nearby vacant table, but Kindred said "she wasn't moving to go anywhere." While Kindred was in the restroom, plaintiff spilled a can of soda on the table. When Kindred returned, she told plaintiff she "was sick and tired of [plaintiff's] B.S." Plaintiff looked at Kindred, and Kindred then reported to a supervisor that plaintiff had called Kindred a "whore." Plaintiff later testified that she "had no reason" to call Kindred a whore. In any event, both plaintiff and Kindred were required to meet with the plant labor relations department, and Kindred was sent home for the remainder of the day. Plaintiff does not know whether Kindred's time off was paid or unpaid. Plaintiff was not suspended for the incident with Kindred, but plaintiff contends that the incident was put on her record.

### E. Grievance Procedure at GM

GM and UAW are parties to a national collective bargaining agreement, and Local 31 and GM are parties to a local collective bargaining agreement. Both collective bargaining agreements govern the hours, wages, working conditions, and other terms and conditions of employment of bargaining unit employees employed at GM's Fairfax plant, including plaintiff.

Prior to plaintiff's resignation as a union member in May 2002, plaintiff was subject to the union's procedural process for handling grievances, which is as follows: The first step is for the employee to call the employee's committee person. The committee person handles the call, and that person either settles the dispute or writes the grievance and takes it forward. Next, at the step and a half, which is handled either by a seasoned committee person or a zone committee person, the grievance can be resolved. If not resolved, then a grievance goes to the second step, which is handled by the zone committee person. After that step, there is a step two and a half, which is handled by the shop chairman. A third step grievance is handled by the UAW International servicing representative, Wilbert Neal. With regard to dispositions of grievances, WWOP means withdrawn without prejudice; compromise means there was some resolution to the grievance which was not construed as either totally granted or withdrawn; granted means that whatever was requested in the grievance was granted; and WWP means withdrawn with prejudice.

A grievance claiming discrimination is referred to as a 6A grievance. The responsibility to investigate 6A grievances falls upon the UAW Civil Rights Committee, of which Barbara Bell was a member. After the UAW Civil Rights Committee investigates a 6A grievance, the investigator fills out the form and turns it into the Union's secretary. After the UAW Civil Rights Committee investigates a 6A grievance, the grievance goes to the second step of the discipline procedure if it needs to go further.

### F. Statements Made (or Not Made) by Union Officials

Plaintiff can recall no statements by union representative Sonny Lyman, plaintiff's zone committee person, which plaintiff felt were inappropriate in terms of her race, sex, disability, or age, other than Lyman laughed when plaintiff told him she

---

**12.** The record is not clear when this incident took place, but the court notes that plaintiff filed a grievance for harassment for singling her out with regard to an incident involving Linda Kindred. The court is unsure whether the incidents plaintiff discusses are the same.

went to the doctor and the doctor said she could "take no more stuff."

John Melton was plaintiff's zone committee person before Sonny Lyman. Plaintiff cannot recall any comments by Melton of a racial or sexual nature. The only comment by Melton regarding plaintiff's purported disability was that plaintiff would have to go back to her doctor and have some of her restrictions removed in order to be able to re-enter the plant, and that Melton did not have job placement for her.

Dan Mallett was the shop chairman for Local 31 prior to John Melton. Plaintiff claims that Mallett engaged in discriminatory conduct towards her when, after plaintiff's car was towed, Mallett wanted to know if plaintiff could get a doctor's statement since plaintiff would not be able to make it to work that day. Plaintiff recalls no other improper statements by Mallett.

Dan Fairbanks was the financial secretary of Local 31. Plaintiff cannot recall any comments by Fairbanks of a racial, sexual, age-related, or disability-related nature, except that plaintiff believed Fairbanks's comment about her not being a member in good standing during a conversation about plaintiff's death benefits related to her disability.

Jim Russell was the Local 31 president. Plaintiff believes that Russell told the United Way not to give plaintiff any more money[13] because Russell wanted her to come back to work. Plaintiff also did not like Russell's tone of voice toward her and his attitude toward plaintiff's co-worker in March 2002 when plaintiff went to review her records.

David Moreno was vice president of Local 31 and engaged in no discriminatory conduct toward plaintiff.

Tim Mallett was plaintiff's committeeman and engaged in no discriminatory conduct.

### G. Plaintiff's Grievance History

At the outset, the court notes that plaintiff filed numerous grievances since 1995. With respect to the grievances plaintiff filed, plaintiff contends that she was discriminated against in the manner in which the grievances were resolved. However, other than simply listing each and every grievance plaintiff filed since 1995, the parties, and in particular the plaintiff, have done an unsatisfactory job of directing the court's attention to the basis upon which plaintiff claims she was discriminated (i.e., race, age, gender, disability, retaliation), and have further failed, in many instances, to set forth the underlying events about which plaintiff complained in her grievances. Moreover, plaintiff fails to set forth any reasons why the resolution of these grievances was inappropriate, leaving the court to presume plaintiff simply wanted more to be done. Notwithstanding these inadequacies, the court will consider plaintiff's grievances in determining whether the Union engaged in discriminatory conduct.

**Grievance Number 12483A**—Plaintiff filed this 6A discrimination or harassment grievance on December 23, 1995. The grievance was settled January 3, 1996, based on the answer given by management, which was "charge and request denied" and "management has no intent on using prejudicial treatment toward any employee."

**Grievance Numbers 14181A and 15227A**—Plaintiff filed this 6A discrimination or harassment grievance (14181A) on April 4, 1997, charging management with

---

**13.** Plaintiff applied for and received benefits from community programs by referral from Bobbie Bennett of Local 31 and by using forms provided by Local 31. As a result, plaintiff received money to help her with her mortgage.

unjust and unfair discipline. This grievance apparently followed plaintiff's suspension for leaving the line without permission on April 4, 1997. With respect to grievance 14181A, committee person Gary Cramer noted that he had talked to several people in shipping who said that there were extra people who could have done plaintiff's job so plaintiff could have gone home in eight hours.

As best the court can discern from the record, plaintiff amended her grievance to add, "I be treated fairly," which became grievance 15227A. After an investigation, the UAW Civil Rights Committee completed an investigation form, indicating that plaintiff was claiming sex discrimination based on this incident. The investigator found that another male employee, who also left the line without permission, was laid off for the balance of shift plus two weeks. The investigator determined that there was no reasonable cause to believe plaintiff was discriminated against and that there was a severe lack of communication between management and plaintiff.

**Grievance Number 15230A**—Plaintiff filed this 6A discrimination or harassment grievance on April 17, 1997. This grievance was withdrawn with prejudice pursuant to paragraph 34 of the UAW agreement.

**Grievance Number 15406A**—Plaintiff filed this 6A discrimination or harassment grievance on October 28, 1997. The nature of the alleged harassment cannot be discerned from the grievance form since the handwriting is unintelligible, but apparently the grievance involved Jim Herdman and Jim Miraglia. The disposition of the grievance was "settled on the basis that supervisor meant no mal intent and will try to resolve these disputes in a business manner."

**Grievance Number 043878**—Plaintiff filed this 6A discrimination or harassment grievance on January 9, 1999. This grievance was withdrawn without prejudice pursuant to paragraph 34 of the UAW agreement.

**Grievance Number 043884**—Plaintiff filed this 6A discrimination or harassment grievance on February 23, 1999. Plaintiff filed this grievance apparently in response to the security incident. This grievance was withdrawn without prejudice.

**Grievance Number 043887**—Plaintiff filed this 6A discrimination or harassment grievance on March 2, 1999. Plaintiff charged management with refusing adequate and reasonable medical treatment for plaintiff's sore ankle, for which plaintiff's doctor had recommended light duty. This apparently involved the incident documented in plaintiff's May 3, 1999 notes set forth above, when the medical department determined that plaintiff did not have a medical problem and, at first refused to treat plaintiff's ankle. Medical ultimately treated plaintiff's ankle that day. This grievance went to step 2 and was compromised.

**Grievance Number 043889**—Plaintiff filed this grievance on March 15, 1999. Plaintiff charged management with towing her vehicle in connection with the towing incident.

**Grievance Number 43058**—Plaintiff filed this 6A discrimination or harassment grievance on November 9, 1999. This grievance was against medical and ADAPT, requesting those departments abide by her doctor's restrictions. This grievance went to step and a half, and it was withdrawn without prejudice. The Civil Rights Committee Investigation Form indicated that plaintiff believed she was discriminated against (based on her sex, race, and disability) because plaintiff felt she should have been given choices in her job placement. The investigator found that plaintiff did not meet the ADAPT guidelines according to Step 1, and there-

fore had been placed on her job in line with her seniority. The investigator concluded that plaintiff's claim had no merit.

**Grievance Number 17967A**—Plaintiff filed this 6A discrimination or harassment grievance on February 9, 2000. Plaintiff filed this grievance against Steve Clark claiming harassment, favoritism, and hostile work environment. The Civil Rights Committee Investigation Form indicated that plaintiff and Steve Clark had a history of hostility and that plaintiff had reasonable cause to believe she had been discriminated against based on plaintiff's co-workers verification that plaintiff had been treated differently than others. Grievance 17967A was resolved by the Union, which withdrew it without prejudice after the civil rights committee's factual investigation. This grievance was withdrawn upon the decision of Sonny Lyman and Ron Whiteman.

**Grievance Number 18395A**—Plaintiff filed this 6A discrimination or harassment grievance on May 17, 2000 and it was withdrawn without prejudice.

**Grievance Numbers 706354 and 706355**—Plaintiff filed these 6A discrimination or harassment grievances on July 24, 2000. These grievances alleged that Pam Goodwin created a hostile work environment and retaliated against plaintiff after Goodwin received a confidential report from the AWARE line. The grievances were compromised, and the disposition states, "management will continue to treat people with respect and dignity when interacting with other employees."

**Grievance Number 706265**—Plaintiff filed this 6A discrimination or harassment grievance on May 2, 2001. This grievance alleged harassment and hostile work environment, and was compromised at step and a half.

### H. Plaintiff's Claims of the Union's Refusal to Process Grievances and Assist Plaintiff

Plaintiff testified in her deposition that the Union refused to process her 6A grievances because of her age. Plaintiff believes her age was a factor because of the Union's alleged refusal to accommodate her in finding a job that limited her climbing. Plaintiff also claims that the Union refused to file a grievance in 1999 regarding plaintiff's disability and GM's alleged failure to accommodate plaintiff in a job position.

Plaintiff also testified in her deposition that the Union refused to write two or three grievances regarding race discrimination. Plaintiff specifically recalled that Mallet would not write a grievance for plaintiff regarding the hangman's noose.[14] Plaintiff also contends that the Union refused to write a 6A discrimination grievance for race discrimination when GM towed plaintiff's car. Plaintiff further contends that committee person Gary Cramer refused to write a grievance for plaintiff against supervisor Lynn Vansell. At the time, Cramer did write a grievance for plaintiff against Steve Clark and Al Milan, but Sonny Lyman told plaintiff that a grievance against Vansell had no merit. In addition, plaintiff claims that she attempted to file a grievance against Miraglia in 2000.

### I. Response by GM and the Union to the Noose Incidents and Other Claims

After the first noose was found, plaintiff and two other employees, Mildred Woody and Beverly Williams, met with Wilbert Neal on February 15, 1999, to discuss their discrimination complaints. The meeting

---

**14.** The record reflects that a grievance was written for Mildred Woody, who actually found the noose, to address the noose incident.

was requested by plaintiff, Woody, and Williams. One of the issues discussed was the noose found by Mildred Woody. The three employees complained that white employees got different treatment than black employees and that black employees were treated differently than white employees when it came to disciplinary action. The employees also requested a full-time civil rights chairperson on the floor. In order to get a full-time civil rights chairperson on the floor, the local bylaws would have to be changed, and then the international union would have to rule on that change. No one ever made a request for a change in the bylaws.

On February 15, 1999, plaintiff and two other employees sent a formal complaint about discrimination at the plant to William Whitcomb, Mediator at the United States Department of Justice.

On February 20, 1999, a meeting was held with Neal, Woody, Beverly Williams, Juanita Williams, plaintiff, Danny Mallett, Jim Russell, John Melton, Dave Moreno, and Donna Birks. The Mildred Woody noose incident was addressed during the February 20, 1999 meeting. As a result of a grievance written on behalf of Mildred Woody, it was recommended that the foreman (Miraglia) should apologize for making the noose. Miraglia admitted to making the noose and apologized. The Union was advised that Miraglia had been disciplined and this was noted in his record. Moreover, as a result of the February 20, 1999 meeting, Neal investigated complaints about committee person Mike Daniels,[15] complaints about committee persons not answering calls, access to safety representatives, and Jobs Bank people working

overtime. Daniels was alleged to have used a racial term toward an African-American female GM cafeteria worker named Tina. Neal arranged a meeting between Daniels and Tina, at which time apologies were exchanged.[16] With regard to committee persons not answering calls, Neal advised Mallett that committee persons or alternates should answer calls as soon as practical. With respect to complaints that black employees received more disciplinary time than white employees, Neal examined disciplinary records and found no truth to the statement.

On March 11, 1999, representatives from the Union and management met with Bill Whitcomb to discuss the noose incidents. During the March 11 meeting, GM reviewed with Whitcomb the nature of the incidents and the response by GM, as well as GM's policies and procedures pertaining to discrimination in the workplace.

On March 24, 1999, GM management and union representatives met with plaintiff and two other employees regarding a series of issues, including the noose incidents and other alleged instances of discrimination, which the employees had raised in a February 1999 petition to management. During the meeting, the participants discussed the issues raised by the three employees, as well as the procedure for raising complaints and GM's policies regarding discrimination and harassment in the workplace. As a result of the meeting, additional training was established to educate workers at the plant regarding the racist symbolism of the noose.

15. On one occasion, plaintiff learned from other employees that union representative Mike Daniels, angry that an African-American female cafeteria employee refused to open the cafeteria doors to allow him to eat lunch early, called the cafeteria employee a "bitch."

16. Since the incident, Tina has become the chairperson of the cafeteria unit. Neal talks to her two or three times a week, and she has not had any further trouble with Mike Daniels.

The Public Review Board (PRB) is a panel of seven individuals, established under Article 32 of the Constitution of the UAW. Under the UAW Constitution, the PRB serves as the forum of ultimate resort for appeals brought to it under the provisions of that constitution. Plaintiff never filed an appeal regarding the handling of her grievances with the Public Review Board or Convention Appeals Committee.

## II. Summary Judgment Standards

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* (citing *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Id.* at 670–71. In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Id.* at 671 (citing *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505; *see Adler*, 144 F.3d at 671 n. 1 (concerning shifting burdens on summary judgment). The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505. Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler*, 144 F.3d at 671. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.*

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut"; rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex*, 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1).

## III. General Motors

### A. Statute of Limitations

#### 1. Timeliness of Filing Charge

■ Exhaustion of administrative remedies is a prerequisite to instituting a Title VII action in federal court. *Khader v. Aspin*, 1 F.3d 968, 970 (10th Cir.1993). A complainant must file a charge with the appropriate state or local agency, or have the EEOC refer the charge to that agency, within 240 days of the alleged discriminatory event to ensure that the claim may be filed with the EEOC within the 300–day limit set forth in Title VII. *E.E.O.C. v. Commercial Office Prods. Co.*, 486 U.S. 107, 110, 108 S.Ct. 1666, 100 L.Ed.2d 96

(1988); *Waller v. Consol. Freightways Corp.*, 767 F.Supp. 1548, 1558 (D.Kan. 1991). In a deferral state such as Kansas, a plaintiff must file Title VII, ADA, and ADEA discrimination charges within 300 days after the alleged discriminatory act occurred. 42 U.S.C. § 2000e–5(e)(1) (Title VII); 42 U.S.C. § 12117(a)(ADA); 29 U.S.C. § 626(d)(2) (ADEA); *Peterson v. City of Wichita*, 888 F.2d 1307, 1308 (10th Cir.1989). In this case, plaintiff filed her charge of discrimination on May 25, 1999. GM contends that plaintiff cannot state a claim under Title VII, the ADEA or the ADA for any alleged discriminatory acts that occurred prior to July 28,1998–300 days before plaintiff filed her charge of discrimination.

■ Plaintiff contends that she has been subject to discrimination since 1996 and that, therefore, the continuing violation doctrine applies, thereby saving plaintiff's otherwise untimely claims. The Supreme Court recently considered whether alleged discriminatory acts which occurred prior to the 300–day statute of limitations are actionable. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). In *Morgan*, the Court issued a twofold ruling. First, the Court held that "discrete discriminatory acts [such as termination, failure to promote, denial of transfer, or refusal to hire] are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Id.* at 2072. Second, the Court held that a hostile work environment claim should be reviewed in its entirety, so long as one of the events comprising it fell within the statute of limitations. Specifically, the Court emphasized:

> A hostile work environment claim is comprised of a series of separate acts that collectively constitute one "unlawful employment practice." 42 U.S.C. § 2000e–5(e)(1).... It does not matter,

for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.

*Id.* at 2074. In so ruling, the Court essentially rejected the continuing violation doctrine and simplified the law by allowing courts to view allegations of hostile work environment as "a single unlawful employment practice." *Id.* at 2075; *see also Boyer v. Cordant Techs., Inc.*, 316 F.3d 1137, 1140 (10th Cir.2003) (holding that "*Morgan* implicitly overruled [prior] Tenth Circuit cases to the extent these cases held that recovery on a Title VII hostile work environment claim is not available for acts taken outside the statutory time period where the plaintiff knew or should have known the conduct was discriminatory when the acts occurred"). Put simply, even if the smallest portion of the alleged discriminatory "practice" occurred within the limitations time period, then the court should consider all of the alleged discriminatory conduct as a whole.

■ Based upon the Supreme Court's decision in *Morgan*, the court in this case concludes that each incident of alleged discrimination and each alleged retaliatory act constitutes "discrete discriminatory acts," such that those which plaintiff alleges occurred prior to July 28, 1998, are untimely. *Id.* at 2073 ("All prior discrete discriminatory acts are untimely filed and no longer actionable.").

However, with respect to plaintiff's claims of hostile work environment, plaintiff claims she was subject to a hostile work environment both before and during the limitations period. Thus, the court will consider those acts which occurred within

the entire time period of the alleged hostile environment for purposes of determining liability.

## 2. Timeliness of § 1981 Claims

GM presumes, for purposes of this motion, that a four-year statute of limitations applies to plaintiff's race discriminations claims brought pursuant to 42 U.S.C. § 1981. *See Harris v. Allstate Ins. Co.*, 300 F.3d 1183, 1192 (10th Cir.2002) (ruling that claims arising under § 1981(a) are subject to the personal injury statute of limitation in the state in which they arise, but claims arising under § 1981(b) are subject to the federal four-year statute of limitations established in 28 U.S.C. § 1658).

■ Plaintiff, however, contends that acts of discrimination that pre-date the statute of limitations period are relevant to showing a continuing violation of discrimination. The Tenth Circuit has specifically rejected application of the continuing violation doctrine to cases arising under § 1981, stating that "because the continuing violation theory is a creature of the need to file administrative charges, and because a section 1981 claim does not require filing such charges before a judicial action may be brought, the continuing violation theory is simply not applicable." *Thomas v. Denny's, Inc.*, 111 F.3d 1506, 1513–14 (10th Cir.1997). Thus, the continuing violation exception is inapplicable to plaintiff's § 1981 claims.

■ Plaintiff filed suit against GM on August 29, 2001. Thus, in ruling on plaintiff's § 1981 claims, the court will consider plaintiff's allegations regarding events which occurred on or after August 29, 1997, four years before plaintiff brought suit against GM.

## B. Hostile Work Environment Claim

Plaintiff claims that she was subjected to a hostile work environment based on her race, sex, age, and disability. GM argues that plaintiff's hostile work environment claims fail as a matter of law.

## 1. Race

■ To survive summary judgment on a claim under a hostile work environment theory,[17] plaintiff must introduce facts that support the inference of a racially hostile environment. Specifically, plaintiff must show that, under the totality of the circumstances, (1) the harassment was pervasive or severe enough to alter the terms, conditions, or privilege of employment, and (2) the harassment was racial or stemmed from racial animus. *Guyton v. Sisu N. Am., Inc.*, 1999 WL 1426142, at *3 (D.Kan. 1999). General harassment, if not racial, is not actionable. Moreover, a plaintiff must show more than a few isolated incidents of racial enmity. Instead of sporadic racial slurs, there must be a "steady barrage of opprobrious racial comments." *Bolden v. PRC Inc.*, 43 F.3d 545, 551 (10th Cir.1994) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) and quoting *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1417–18 (10th Cir. 1987)).

In her brief, plaintiff states that the following incidents support her claim of a racially hostile work environment: the three nooses found at the plant; a black female cafeteria employee being called a "black bitch"; two of plaintiff's co-workers making racial comments to plaintiff about her goddaughter, who is white (the photograph incident); white male employees who left work after an eight-hour shift

---

**17.** The court analyzes § 1981 discrimination claims according to the same scheme of proof as Title VII discrimination claims. *See Patterson v. McLean Credit Union*, 491 U.S. 164, 186, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989); *Durham v. Xerox Corp.*, 18 F.3d 836, 839 (10th Cir.1994).

were not disciplined, where plaintiff was; five of the six cars towed in March 1999 belonged to black employees; older black women were certified, audited, monitored, and nit-picked by their white supervisors; and white employees were treated more favorably and were favored for better shifts, overtime, and easier jobs.

With respect to plaintiff's contentions, the court makes' several observations. Foremost, with regard to the black female cafeteria employee, the court has reviewed plaintiff's deposition testimony. Nowhere does plaintiff testify that she heard the black female employee was called a *"black bitch."* Rather, plaintiff testified that she learned of a committee person "calling a black woman a bitch," (Pl.'s Dep. at 225), and later responded "yes" when asked whether plaintiff recalled an incident "when a committeeman had called a black woman a bitch," (Pl.'s Dep. at 267). There is nothing in the record indicating the female employee was called a "black bitch."

Next, plaintiff points to her April 1997 suspension for leaving the line after eight hours without permission. The court first notes that, when initially asked by management to produce a doctor's note, plaintiff was unable to do so. Further, plaintiff's contention that white male employees were not disciplined for the same conduct is pure speculation. With respect to Wayne Haddock (August 6, 1997), plaintiff documented in her notes that "Haddock went home in eight hours. Herdman was looking for him and was never found.... Wayne is not disciplined but now team leader." Regarding Billy Bob (August 11, 1997), plaintiff wrote "Billy Bob (ex team leader) came back to work aftyer [sic] a lengthy illness. Left in eight hours." Plaintiff offers nothing to suggest that either of these men were scheduled or as-

signed to work more than eight hours, and there is nothing in the record (i.e., plaintiff's notes) which states that Billy Bob was not disciplined.

Plaintiff next claims in her brief that five of the six cars towed in March 1999 belonged to black employees. However, there is absolutely nothing in the record indicating that five of the six cars towed belonged to black employees. Rather, plaintiff testified in her deposition that, other than Phyllis Edwards, who is a black female, plaintiff is not aware of the identity of *any* individual who had his or her car towed.[18] Plaintiff stated in her deposition that she was merely told by Phyllis Edwards that five of the six cars belonged to black females. But the affidavit of Phyllis Edwards contained in the record makes no statement about or reference to the race of any other vehicle owner.

Finally, plaintiff cites four allegations in her brief in support of her contention that white employees were treated more favorably and were favored for better shifts, overtime, and easier jobs. For example, plaintiff claims that when two supervisors switched shifts on June 2, 1997, a white male employee (Wayne Haddock) began working overtime, and the new supervisor (Herdman) "showed nothing but favoritism toward the white male workers." Plaintiff, however, provides no specifics, nor does she contend that she was somehow denied overtime to which she was entitled. In the other three allegations to which plaintiff cites (January 11, 2000 Jack Betts incident, William's allegations that she was treated differently and that temporary employees being allowed to work overtime), plaintiff fails to identify the race of any of the employees she claims received more favorable treatment than African–Ameri-

**18.** Interestingly, later in plaintiff's deposition, plaintiff testified that Phyllis Edwards moved her (Ms. Edwards's) vehicle before it was

towed. (Pl.'s Dep. at 101) ("[Phyllis Edwards] snatched her car so they wouldn't tow hers.... She moved her car, yes.").

cans. Other than those supporting contentions which plaintiff cites in her brief, the court, in its own search of the record, considers plaintiff's factual contentions regarding her desire to work in the audit department. (*See supra* June 10, 12, 19, and 20, 1997 incidents). However, plaintiff offers no information regarding the manner in which employees are selected to work in the audit department, whether plaintiff was qualified to work in audit, whether and, if so, whom, she asked to get training for audit, and offers nothing to dispute the fact that GM lacked sufficient manpower to send her to audit on the dates at issue.

The court next considers the three nooses found at the plant, two of plaintiff's coworkers making racial comments to plaintiff about her white goddaughter, and older black women being certified, audited, monitored, and nit-picked by white supervisors.

The court first turns to the noose incidents. Foremost, the court points out that plaintiff admittedly never saw a noose hanging in the workplace, and was on a leave of absence when at least one of the incidents occurred. Plaintiff acknowledges that she only learned about the incidents through after-the-fact discussions with coworkers, and that on the one occasion, when plaintiff saw a fellow employee carrying in her hand what plaintiff subsequently learned was a noose, plaintiff was unaware at the time of what the object was.

Plaintiff points to *Hirase–Doi v. U.S. West Communications, Inc.*, 61 F.3d 777, 782 (10th Cir.1995), for the proposition that a plaintiff may establish the existence of a hostile work environment claim based

upon evidence of harassment toward others as long as plaintiff was aware of such conduct. In *Hirase–Doi*, the plaintiff claimed that she was subjected to a sexually hostile work environment. Plaintiff's allegations involved a male employee who made repeated sexual remarks and advances toward many of the women with whom the male employee worked, including the plaintiff, which ultimately culminated in a sexual assault on the plaintiff. The Tenth Circuit concluded that a plaintiff "may only rely on evidence relating to harassment of which she was aware during the time that she was allegedly subject to a hostile work environment." *Id.* Specifically, the court held that a plaintiff "may establish the existence of a genuine issue of material fact as to whether she was subject to a hostile work environment based on evidence of [an employee's] sexually offensive conduct *towards herself* and/or others in her office, provided she was aware of such conduct." *Id.* (emphasis added).

The court determines that, in these circumstances, plaintiff's after-the-fact awareness of three nooses being found at the plant does not, itself, create a genuine issue of fact that plaintiff was subject to a racially hostile work environment. The court in *Hirase–Doi* explicitly declined to rule on the issue of whether "at least some evidence of hostility directed toward plaintiff [is required]," since the plaintiff in that case was herself was subject to sexual advances. *Id.* As such, the court in this case will consider the noose incidents, but plaintiff must also establish some evidence of racial hostility directed toward her during the time period she became aware of the nooses.[19]

**19.** The court believes this requirement is proper in the circumstances of this case. Otherwise, if the court were to hold that plaintiff's awareness of the nooses, in and of itself, established a hostile work environment, then each and every employee at GM who also heard about the nooses could theoretically assert a claim against GM. The court does not believe that Title VII or § 1981 provides for such a cause of action.

Likewise, with respect to plaintiff's contentions that older black women were being certified, audited, monitored, and nit-picked by white supervisors, plaintiff cites to Woody and Carter's affidavit testimony. Woody asserted that Lussier and Miraglia "nit-picked at the black women and their work" and subjected them to "greater scrutiny of their work." Carter asserted that Lussier would "monitor her work," would repeatedly call Carter into the office "to criticize her" and threaten her with write-ups, and that Glenn Matthews monitored Carter's restroom breaks. Plaintiff never testified that she was aware of Woody and Carter's discriminatory allegations during the period of time plaintiff allegedly suffered harassment, but even if she had, such testimony does not create a genuine issue of fact that plaintiff herself was subjected to a racially hostile work environment.

Upon its own review of the record, the court notes that plaintiff does state facts that she was counseled or certified at various times. *See supra,* September 8, 1997 (counseled for discrepancy); September 24, 1997 (counseled for being late); May 4, 1998 (counseled); May 11, 1998 (counseled); and May 12, 1998 (counseled). Interestingly, plaintiff never asserts that these counselings or certifications were unwarranted. Plaintiff points to the May 14, 2001 incidents, where the acting team leader accused plaintiff of not checking a car and Clem H, supervisor in the training department, said plaintiff missed one. Two days later, plaintiff asserts that she pointed out to Rick McAndrews, Clem H. and Sieg Siegele that Jack Betts was the one who tagged the cars that they accused her of missing, but that they didn't say anything to Betts. However, plaintiff concedes that the supervisor said he was not accusing her of wrongdoing, but merely indicated to her that a car came down the line without a "punch" on it-indicating that it had been "checked"-and in counting

back it appeared to be plaintiff's car. The court notes that plaintiff offers nothing to support the allegation that GM management never spoke to Betts regarding his job performance.

Additionally, plaintiff points to her issues with Glenn Matthews as evidence of a racially hostile work environment. Plaintiff states that Matthews's discriminatory animus toward plaintiff is evidenced by him calling her a "lame bitch," and by his refusal to relieve her, but not her male co-workers, for restroom breaks. The court found only one incident in the record where Matthews in fact did not relieve plaintiff for a restroom break when she pulled the cord (February 18, 2002). However, plaintiff has failed to allege that Matthews (or any other employee) was actually available to relieve plaintiff at the time she requested, and there is nothing in the record demonstrating that Matthews relieved other white employees for restroom breaks under the same circumstances. Plaintiff also complains about Matthews's cigar smoking and his expelling flatus inside vehicles plaintiff was to later inspect.

Plaintiff also claims that she was "repeatedly" escorted to labor relations by security, where white, male employees were not (December 11, 1997, May 13, 1998, and July 21, 2000). Again, there is nothing in the record to indicate that escorting plaintiff to labor relations was not appropriate under the circumstances or that any other white individual acted in a similar fashion to plaintiff but was not escorted by security to labor relations.

The only racial remarks made to plaintiff were Wayne Haddock and Norman Breedlove's comments when plaintiff showed them a picture of her goddaughter (the photograph incident). Pointing to a small black patch on the photograph, both men made a comment about seeing nothing "but the teeth." The court considers

these comments, at most, an isolated incident of racial enmity. The record contains no other evidence of racial slurs or comments directed to either plaintiff or others. These comments are too few and far between to support a racial harassment claim. *See Woodland v. Joseph T. Ryerson & Son, Inc.*, 302 F.3d 839, 844 (8th Cir.2002) (sporadic racially-motivated misconduct by coworkers not enough to create hostile work environment).

The record is replete with allegations by plaintiff which she claims are evidence of a racially hostile work environment. Clearly, plaintiff had problems interacting with her various supervisors, but there is little evidence to indicate that such problems stemmed from any racial motivation. However, all justifiable inferences are to be drawn in plaintiff's favor, and the court must consider plaintiff's allegations under the totality of the circumstances. Moreover, the court must not, at this juncture, engage in a mini-trial. Rather, credibility determinations and the weighing of evidence must be left to a jury.

In light of these standards, the court determines that a jury could find that the evidence-taken as a whole-shows that plaintiff may have suffered racial harassment. The noose incidents and the affidavits of plaintiff's co-workers are evidence tending to show that the work environment in which plaintiff worked was racially charged. This evidence, coupled with the photograph incident and plaintiff's allegations involving facially neutral conduct, creates a question of fact such that summary judgment on this claim is inappropriate.

### 2. Gender

To establish a claim of sexual harassment, plaintiff must prove that she was harassed on account of her sex and that the harassment affected a term, condition, or privilege of her employment. *McDon-*

*nell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). In determining whether a work environment is so pervasively hostile that it amounts to sexual harassment, the court must look at the totality of the circumstances confronting the affected workers. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 25, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); *Meritor*, 477 U.S. at 67, 106 S.Ct. 2399; *Hicks*, 833 F.2d at 1414.

An employee who is subjected to a steady stream of vulgar and offensive epithets because of her gender has a potential claim for hostile work environment harassment. *Gross v. Burggraf Constr.*, 53 F.3d 1531, 1539 (10th Cir.1995). Words which are "intensely degrading, deriving their power to wound not only from their meaning but also from 'the disgust and violence they express phonetically'" may form the basis for a hostile environment claim. *Id.* (citation omitted). On the other hand "casual or isolated manifestations of a discriminatory environment ... may not raise a cause of action." *Hicks*, 833 F.2d at 1414 (quoting *Bundy v. Jackson*, 641 F.2d 934, 943 n. 9 (D.C.Cir.1981)). The offensive acts need not be purely sexual; it is sufficient that they would not have happened but for claimant's gender. *Id.* at 1415.

The only alleged acts of a plainly sexual nature are the four comments from plaintiff's former supervisor, Steve Clark, over the course of at least one year. *See, infra* 1) Clark looked at plaintiff's breasts and told her that he "love[d] to see [her] jump rope"; 2) "You are looking in my eyes and I can tell by your eyes that you want me"; 3) "You know, you are becoming a real pain in my ass, that's a good pain"; and 4) Clark told plaintiff that he would "rather have [her] work eight hours [per day] than not at all." Plaintiff also contends that Clark's placement of a piece of cake on

plaintiff's work station was an act of sexual harassment, ignoring the fact that Clark simultaneously gave a piece of cake to a male employee in the same area.

The court considers the comments of Steve Clark similar to those of the supervisor in *Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355 (10th Cir.1997). In *Sprague,* the plaintiff alleged five separate incidents of sexually-oriented, offensive incidents: (1) a statement to plaintiff that "you really need to undo that top button"; (2) a statement correcting another person's reference to "girls" by saying that "you can't call them girls[,][y]ou have to call them ladies"; (3) a comment, regarding women and pre-menstrual syndrome, that "you know how they are at that time of the month"; ( 4) a comment after looking down plaintiff's wedding dress, that "you got to get it when you can"; and (5) in a conversation about "neck chains," a comment that "neck chains" sounded "kind of kinky." *Id.* at 1366. The Tenth Circuit court held that this conduct was "unpleasant and boorish," but not pervasive or severe enough to create an actionable hostile work environment claim. The court also concluded that the conduct "occurred sporadically," a period of over sixteen months. *Id.*

The court concludes that, although the comments made by Steve Clark were inappropriate and insensitive, they are not sexually explicit or intimidating in nature. Moreover, the comments occurred over the course of one year. Accordingly, these comments, standing alone, do not support a hostile environment claim. However, in considering plaintiff's sexual harassment claim, the court must look to the totality of the circumstances to determine whether the environment in which plaintiff worked was sexually hostile.

The court looks to the grievance filed by plaintiff against Steve Clark, claiming harassment, favoritism, and hostile work environment based on sex. The Civil Rights investigator indicated that plaintiff and Steve Clark had a history of hostility and that plaintiff had reasonable cause to believe she was discriminated against based on plaintiff's co-workers verification that plaintiff is treated differently than others.

Plaintiff points to her factual contentions regarding her desire to work in the audit department. (See June 10, 12, 19, and 20, 1997 incidents) and that male employees were not asked why they were late (December 12, 1997). As additional support, plaintiff again turns the court's attention to the affidavits of Williams and Woody. Woody asserts that "Miraglia was very nasty with black females.... Miraglia would stand back and yell at the black women but would not yell at the men." The court points out that Woody does not contend that Miraglia's tone of voice was not warranted, nor does Woody support her allegation by setting forth an example of when a male engaged in similar conduct but was not yelled at.

Finally, plaintiff claims that two of her male coworkers, Paul Grice and Ron Lewis, made various errors that were never addressed by supervisors. GM records indicate that both Lewis and Grice received counseling on numerous occasions and that shortcomings in their work were often criticized and documented, but the court cannot determine whether those reprimands occurred as a result of the incidents about which plaintiff complains.

Viewing all reasonable inferences in favor of plaintiff and considering plaintiff's allegations under the totality of the circumstances, the court concludes that plaintiff's claim should be determined by a jury. Plaintiff's allegations include the incidents with Steve Clark, along with accusations of plaintiff and plaintiff's co-workers that men were treated more favorably. This

evidence, when viewed as a whole, creates a question of fact as to whether plaintiff suffered sexual harassment. Summary judgment on this claim is denied.

### 3. Age

For an age-related hostile work environment claim to survive summary judgment,[20] a plaintiff "must show under the totality of the circumstances that the harassment was pervasive or severe enough to alter the terms, conditions, or privileges of employment, and the harassment stemmed from ... age-related animus." *Holmes v. Regents of Univ. of Colo.*, No. 98–1172, 1999 WL 285826, at *7 (10th Cir. May 7, 1999) (citing *Bolden*, 43 F.3d at 550–51).

In support of her claim, plaintiff argues that her claim of age-related harassment is intertwined with her race and gender claims "as the evidence shows that the animus by GM management was primarily directed at older black women." (Pl.'s Mem. at 95). Plaintiff also contends that several of her co-workers made age-related comments, that a supervisor remarked to Jacqueline Carter that she should retire, and that employees at the Fairfax plant are hiring younger people and arranging for their children and other relatives to be hired in place of older employees.

The court concludes that plaintiff has failed to make a sufficient showing that she endured a hostile work environment because of her age. Unlike plaintiff's ra-

cial and sexual harassment claims, there simply is no evidence of age-related animus for the court to consider. The record reveals no details regarding when any alleged age-related comments were made to plaintiff, who made them, and most importantly, what was said. Moreover, one comment to plaintiff's co-worker about retiring does little to establish that the work environment in which plaintiff worked was permeated with discriminatory intimidation, ridicule, and insult, especially when plaintiff does not allege that she was aware of Carter's discriminatory allegations during the period of time plaintiff allegedly suffered age-related harassment. Finally, the court concludes that the hiring of younger people and relatives, even if true, does not support an inference of an age-related hostile work environment. There is no evidence that GM exclusively hires "younger people" or that the employees' relatives to which plaintiff refers are not themselves over 40 years old. Moreover, plaintiff never alleges that she was denied a position in favor of a younger employee. Taking into account the totality of the circumstances, the court determines that no reasonable jury could conclude that plaintiff was subjected to a hostile work environment based on her age.

### 4. Appropriate Remedial Action

GM argues that, even if plaintiff survives summary judgment on her hostile work environment claims, GM is still not liable because it undertook appropriate re-

---

**20.** The issue of whether a hostile environment claim is actionable under the ADEA remains unsettled in the Tenth Circuit. *Phillips v. Moore*, 164 F.Supp.2d 1245, 1253 n. 7 (D.Kan.2001) (citing *Holmes v. Regents of Univ. of Colo.*, No. 98–1172, 1999 WL 285826, at *7 n. 6 (10th Cir. May 7, 1999)). Although the circuit has not expressly recognized a cause of action for hostile work environment under the ADEA, it has considered a case where the plaintiff raised the issue. *Holmes,*

1999 WL 285826 at *7 (citing *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1129 (10th Cir.1998)) (considering and deciding a hostile work environment claim under the ADEA, but not addressing the apparent lack of authority for raising such a theory). For purposes of this case, the court assumes, without deciding, that plaintiff may advance a hostile work environment claim under the ADEA.

medial action in response to plaintiff's complaints.

■ The touchstone for the evaluation of an employer's response to harassment is reasonableness. An employer is not strictly liable for all harassment of which it actually or constructively knew; it may discharge its obligation by taking appropriate remedial or preventative action. *Meritor*, 477 U.S. at 72, 106 S.Ct. 2399. Under the law in this circuit, the court must ask whether the remedial and preventative action was "reasonably calculated to end the harassment." *Adler*, 144 F.3d at 676.

This case does not involve an employer who fails to take corrective action in response to harassment claims. To the contrary, the record is replete with instances in which GM investigated complaints and issued counselings and reprimands as a result. For example, GM investigated plaintiff's complaints regarding Steve Clark, and although it found no evidence to corroborate plaintiff's claims of harassment, plaintiff had no future problems with her former supervisor. With regard to the towing, GM reimbursed plaintiff and modified its policy regarding parking in handicapped spaces at the plant.

Regarding plaintiff's allegations surrounding the alleged nooses at the plant, GM's response to those situations was considerable. The supervisor who acknowledged creating one of the nooses was reprimanded, and an hourly employee who hung a second noose was suspended. With regard to the third alleged incident, GM investigated, but was unable to determine who had created the noose and was therefore unable to take action. Moreover, GM management conducted a series of meetings with plaintiff and other coworkers, as well as a meeting with the United States Department of Justice to address employee concerns, distributed literature reaffirming its policies regarding discrimination and harassment, and required supervisors to take courses in race relations.

Having recognized the fact that, in many instances, GM undertook remedial measures, the court must deny summary judgment. The court concludes that a jury should decide whether those remedial actions were sufficient. A jury also should determine whether some instances, in which GM took no action, indeed warranted remedial measures. There are questions of fact surrounding those instances, and the court cannot determine from the record before it whether GM's responses were reasonable.

## C. Disparate Treatment Claim

Plaintiff claims that she was subject to disparate treatment based on her race, gender, and age. To determine whether plaintiff can survive summary judgment, the court applies the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. at 802–05, 93 S.Ct. 1817. Under *McDonnell Douglas*, in order to survive summary judgment, plaintiff must first establish a prima facie case of discrimination. To establish a prima facie case of disparate treatment, plaintiff must show that 1) she belongs to a protected class, 2) she suffered an adverse employment action, and 3) defendant treated similarly situated employees differently. *Trujillo v. Univ. of Colo. Health Scis. Ctr.*, 157 F.3d 1211, 1215 (10th Cir.1998). If the plaintiff carries that burden, the defendant must then articulate a facially nondiscriminatory reason for the challenged employment action. If the defendant makes such a showing, the burden reverts to the plaintiff to prove the proffered nondiscriminatory reason is pretextual.

As with Title VII claims, the court applies the same *McDonnell Douglas* burden shifting framework to § 1981 and ADEA

claims. *Drake v. City of Fort Collins*, 927 F.2d 1156, 1162 (10th Cir.1991); *Lucas v. Dover Corp.*, 857 F.2d 1397, 1400 (10th Cir.1988). However, it bears noting at this point the temporal parameters set forth previously in this order. With respect to plaintiff's race, gender, and age disparate treatment claims brought under Title VII and the ADEA, the court will consider only those allegations regarding events which occurred on or after July 28, 1998. Regarding plaintiff's race discrimination claims brought pursuant to § 1981, the court will consider only those allegations regarding events which occurred on or after August 29, 1997.

The court begins its analysis of plaintiff's disparate treatment claims by setting forth the standard for determining what constitutes adverse employment action. The Supreme Court has explained that a "tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). The Tenth Circuit liberally defines the phrase "adverse employment action." *Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 532 (10th Cir.1998). "Such actions are not simply limited to monetary losses in the form of wages or benefits. Instead, we take a 'case-by-case approach.'" *Id.* Nevertheless, the court will not consider "a mere inconvenience or alteration of job responsibilities" to be an adverse employment action. *Id.* (quoting *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir.1993)).

The court looks to several cases in this circuit for guidance. In *Amro v. Boeing Co.*, 232 F.3d 790 (10th Cir.2000), the Tenth Circuit held that the plaintiff failed to demonstrate adverse employment action where his supervisor called him a "fucking foreigner;" placed his hands around the plaintiff's neck and patted him down, apparently to ascertain whether the plaintiff had a tape recorder; threw drawing papers at the plaintiff, causing a paper cut on plaintiff's neck; demanded to search through a folder that the plaintiff was carrying; and, on two other occasions, spoke unpleasantly to the plaintiff. *Id.* at 795. According to the court, such "unpleasant and vulgar" encounters were simply not "sufficiently negative and pervasive to create an adverse employment action." *Id.* at 798.

Moreover, in *Heno v. Sprint/United Management Co.*, 208 F.3d 847 (10th Cir. 2000), the Tenth Circuit concluded there was no adverse employment action where the plaintiff "was working in the same job, for the same pay, with the same benefits. Moving her desk, monitoring her calls, being 'chilly' towards her, and suggesting that she might do better in a different department simply did not affect [plaintiff's] employment status." *Id.* at 857. The Tenth Circuit also found no adverse employment action in *Sanchez*, 164 F.3d at 533, where the plaintiff's supervisor made several ageist remarks; required plaintiff (but no one else) to bring a doctor's note when she was sick; threatened to write plaintiff up for insubordination; and threatened to put plaintiff on a plan for improvement. Analyzing these allegations, the Circuit stated:

> Courts considering the issue have held that "'unsubstantiated oral reprimands' and 'unnecessary derogatory comments'" such as those alleged here are not included within the definition of adverse action absent evidence that they had some impact on the employee's employment status.
>
> .... It follows that "not everything that makes an employee unhappy" qualifies

as retaliation, for "otherwise, minor and even trivial employment actions that 'an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit.'"

*Id.* (citations and quotations omitted).

Plaintiff asserts in her brief that she was subjected to disciplinary action, threatened disciplinary action, suspensions with lost pay, reassignments to jobs that violated her restrictions, and unwarranted periods of sick leave without pay. Plaintiff also complains of the security incident and the towing incident.

■■■ The majority of plaintiff's disparate treatment complaints cannot survive summary judgment because plaintiff suffered no legally cognizable adverse employment action. As for many of the discipline actions and purported threats of disciplinary action, plaintiff has not demonstrated that these acts constituted "a clear, concrete or significant risk to future employment opportunities" so as to constitute an adverse employment action. *Kennedy v. Gen. Motors Corp.,* 226 F.Supp.2d 1257, 1267–69 (D.Kan.2002) (holding that certification, monitoring, criticism, refusal to permit rotation, supervisor reprimands, efforts to stop grievance investigations, co-worker threats, managerial verbal abuse, and denial of vacation and bereavement leave were not, in and of themselves, adverse actions). For example, many of the facts plaintiff cites in support of her claim involve incidents in which she was merely counseled or issued a notice or written reprimand, which are simply too inconsequential to constitute actionable adverse actions.

■■■ Plaintiff also asserts the towing of her vehicle was discriminatory, but plaintiff does not deny that she lacked the required plant permit, that other individuals' cars were also towed (of whom she could not recall their races), that she received a warning prior to the towing, and

that she was reimbursed for her towing expenses. Moreover, plaintiff cannot establish that the towing constituted a significant change in employment status so as to constitute an adverse action. The court concludes that the towing of plaintiff's vehicle was, at most, a mere inconvenience and is not actionable under a disparate treatment theory.

■■■ With regard to the security incident, plaintiff concedes that she was never touched or actually compelled to leave by the security guards, and that she left the office and plant on her own accord. The fact that plaintiff may have engaged in an argument with the supervisor in question is of no import, as increased tension and unpleasant relationships between employees are not considered actionable adverse actions. *See Heno,* 208 F.3d at 857; *Amro,* 232 F.3d at 795–99.

Moreover, even if the towing incident or the call to security to remove plaintiff from the supervisor's office could be considered adverse employment actions, plaintiff is unable to demonstrate that employees in similar situations were not subject to the same treatment. For example, plaintiff has not alleged that any other employees refused to leave a supervisor's office after being asked to do so, thereby conceding her inability to establish a prima facie case. *See Hall v. United Parcel Serv.,* 2000 WL 1114841, at *7 (D.Kan. July 31, 2000) (rejecting plaintiff's race discrimination claim stemming in part from supervisor's decision to call police when plaintiff refused requests to leave a control tower, holding that the plaintiff did not establish a prima facie case in that he "failed to show ... that similarly situated non-minority employees have been or would have been treated differently"). As for the towing incident, plaintiff has acknowledged that five other employees also had their cars towed, but that plaintiff lacks admissi-

ble evidence regarding their race, and also admitted that she was unaware of any employee whose vehicle was allowed to remain in a designated handicapped space without the requisite plant permit.

The record indicates that plaintiff has been suspended during the course of her employment, which the court considers adverse action. As a preliminary matter, the three suspensions set forth in the record all took place more than 300 days before plaintiff filed her charge of discrimination, and any claim regarding them is therefore time-barred under Title VII and the ADEA. However, plaintiff's December 12, 1997 and May 12, 1998 suspensions fall within the four-year limitations period applicable to plaintiff's § 1981 claim. Therefore, the court will address whether plaintiff can establish a submissible claim of race discrimination regarding the suspensions.

■ Plaintiff cannot survive summary judgment on her disparate treatment claim regarding her suspensions because she has failed to produce evidence regarding more favorable treatment afforded to similarly situated employees outside of her protected class. With regard to the December 1997 suspension, plaintiff concedes that she refused her supervisor's request to accompany him to the labor relations department, and that she mocked his clothing, which he took as an insult. Nowhere in the record has plaintiff pointed to a non-minority employee who behaved in a similar manner toward a supervisor and was not suspended. As for the May 1998 suspension, plaintiff is unable to recall the facts or circumstances surrounding the discipline and, therefore, obviously cannot demonstrate that a similarly situated employee outside of a protected class received more favorable treatment. As a result, plaintiff cannot establish a prima facie claim of race discrimination with regard to any suspension.

Finally, plaintiff contends that the initial denial of her sick leave benefits in late 1998 was discriminatory. While it is difficult to ascertain what actually occurred from plaintiff's accounting of events, it appears that there was some confusion as to whether plaintiff should have returned to work in a closed-toe shoe, which plaintiff later contended she was unable to do. Although plaintiff claims Cecil Oldham unjustly denied her claim for sick leave benefits, plaintiff has set forth no admissible evidence to establish that Oldham was ultimately responsible for, or even capable of, such an action. In addition, it appears that Oldham took affirmative measures to resolve the dispute and requested that plaintiff be paid benefits for the lost time, rebutting any contention that he was engaged in a campaign of unlawful discrimination against plaintiff.

■ With respect to plaintiff's claims that she suffered disparate treatment based on her age, the court concludes that summary judgment is appropriate. Plaintiff alleges that GM is attempting to force her from her job and replace her with a younger employee. However, plaintiff continues to work at the plant, making her claim that she is being "pushed out" inherently speculative and, at a minimum, premature. Moreover, plaintiff never alleges that she was denied a position in favor of a younger employee.

■ Additionally, plaintiff complains that the plant is arranging for relatives of its current employees to fill open jobs, which she suggests is designed to displace employees with greater seniority. Regardless of whether this actually is occurring, nepotism cannot be equated with age discrimination, and is not actionable under federal antidiscrimination law. *See Cozad v. Bentsen,* 1995 WL 93384, at *1 (10th Cir.1995) ("The fact that a defendant's reasons may have been irrational, or not at-

tributable to legitimate business considerations, or even a pretext for nepotism does not create a jury question on discriminatory pretext absent some evidence that the reasons were motivated by a discriminatory animus.") (citing *EEOC v. Flasher Co.*, 986 F.2d 1312, 1319–21 (10th Cir.1992)). As stated above, plaintiff puts forth no evidence that the employees' relatives to which plaintiff refers are not themselves over 40 years old, nor can plaintiff point to a single job position given to a younger employee that she was denied. Plaintiff cannot establish that she suffered any adverse employment action based on her age.

### D. Retaliation Claim

To establish a prima facie case of retaliation, plaintiff must show that: (1) she engaged in protected opposition to discrimination; (2) defendant subjected her to an adverse employment action subsequent to the protected activity; and (3) a causal connection exists between the protected activity and the adverse employment action. *Pastran v. K–Mart Corp.*, 210 F.3d 1201, 1205 (10th Cir.2000). Once plaintiff establishes a prima facie case, the burden of production shifts to defendant to articulate a legitimate, nondiscriminatory reason for the adverse action. If defendant presents evidence of a legitimate business reason, the plaintiff must then be allowed to demonstrate that the defendant's offered reasons are a mere pretext for discrimination. *Berry v. Stevinson Chevrolet*, 74 F.3d 980, 986 (10th Cir.1996).

Foremost, the court recognizes that plaintiff has made multiple complaints of discrimination and harassment throughout her employment. As an initial matter, not every complaint plaintiff has set forth constitutes "protected activity." *Robbins v. Jefferson County Sch. Dist. R–1,* 186

F.3d 1253, 1260 (10th Cir.1999) (holding that frequent, voluminous and sometimes acrimonious complaints and antagonistic behavior toward superiors, including accusing a supervisor of slander, malicious intent, and lying, did not constitute protected opposition). As such, the court will not construe all of plaintiff's complaints as "protected activity."

Plaintiff has failed to allege with any degree of specificity what facts she believes constitute retaliatory harassment which might rise to the level of an adverse employment action. Plaintiff merely claims that she was subjected to harassment, isolation, ridicule, and reprimand, and that each time she filed a grievance or made a call to the hotline, she was harassed, criticized, or written up.

Plaintiff cites only two specific incidents in the argument section of her brief that she claims were retaliatory. First, plaintiff points to the towing of her car, which she states occurred the night before a meeting with a Department of Justice representative regarding plaintiff's complaints. However, there is no evidence in the record that Stan Berry, whom she claims ordered the towing, was even aware of the meeting or plaintiff's complaint, nor does plaintiff make any effort to explain why Berry would also order the towing of numerous other vehicles. Moreover, the court already has determined that the towing of plaintiff's vehicle does not constitute an adverse employment action.

Plaintiff also complains that she was told in February 2000 that she was not to work outside her footprint,[21] but she fails to identify the individual who gave her such a directive, nor has plaintiff shown how this order had an adverse effect on the terms and conditions of her employment so as to

---

**21.** Interestingly, plaintiff asserts in her statement of facts that "[t]he rule in the workplace is that the job should be done within the worker's 'footprint.'" (Pl.'s Statement of Fact ¶ 275).

be actionable. In addition, plaintiff's complaint that Glenn Matthews was allowed to go "wherever he wants to in the plant" carries no weight with regard to plaintiff's situation, given that Matthews worked as a team leader who went throughout the plant relieving employees at various stations. Finally, plaintiff's generalized allegation that she "was held under the magnifying glass ... and harassed, criticized and written up" every time she complained of discrimination is not supported by any record citations or any explanation as to how such scrutiny might be considered an adverse employment action.

██ Upon its own search of the record, the court has found three instances where plaintiff asserts that she believed she was retaliated against. On July 20, 2000, GM labor relations representative, Pamela Goodwin, called plaintiff into a meeting to speak with plaintiff about plaintiff's disputes with Matthews. Goodwin informed plaintiff that Matthews had complained about her. Plaintiff believes Goodwin (who is African–American) was speaking with plaintiff in retaliation for plaintiff's calls to the GM Aware Hotline. Plaintiff asserts she called the hotline on January 10, twice on May 1, and on May 15, 2000. Even if the court construes plaintiff's confidential calls to the hotline as protected activity, Goodwin's informing plaintiff of a complaint by a fellow co-worker does not amount to an adverse employment action.

Plaintiff also states that, on December 11, 1997, she received a medical pass from Miraglia to go to medical for pain in her shoulder and that the next day she was suspended. The court finds that this act of alleged retaliation (which occurred prior to July 28, 1998) is a discrete act and, as such, is barred under *Morgan*. *Morgan*, 536 U.S. at 114, 122 S.Ct. 2061 ("Each incident of discrimination and **each retaliatory adverse employment decision** constitutes a separate actionable 'unlawful em-

ployment practice.' [Plaintiff] can only file a charge to cover discrete acts that 'occurred' within the appropriate time period.") (emphasis added). However, even if the court considered this conduct, plaintiff cannot establish a prima facie case because a request for a medical pass is simply not a protected activity. Moreover, plaintiff does not dispute that she used abusive language toward Miraglia and refused to accompany Miraglia to the labor relations department, which are the reasons stated by GM for plaintiff's suspension. Finally, plaintiff contends that her March 1997 suspension for leaving the line early was in retaliation for her complaints about Steve Clark. The court also finds this incident time-barred under *Morgan*. In any event, plaintiff concedes that the supervisor who suspended her never mentioned her allegations, and that she has merely assumed that "[a]ll supervisors are familiar with other supervisors." In addition, plaintiff could not recount under oath the dates on which the events involving Clark occurred, making it impossible for the court to determine the proximity between her complaints and any conduct she deems retaliatory.

The court concludes that plaintiff has failed to establish that she suffered any adverse employment action as a result of GM's alleged retaliatory conduct. The acts plaintiff contends were retaliatory, when considered either individually or in the aggregate, did not alter the terms or conditions of plaintiff's employment. Moreover, plaintiff has established no causal link between her activities and the alleged retaliatory action. Rather, plaintiff merely rests her retaliation claim on the fact that she has raised multiple claims of discrimination over the course of her employment. Regardless of an employee's participation in protected activity, however, she "may not simply hold her employer hostage by proclaiming that any adverse

employment decision will be construed as discriminatorily motivated." *Hernandez v. McDonald's Corp.*, 975 F.Supp. 1418, 1427 (D.Kan.1997). Even where a plaintiff has established an inference of retaliatory motive based on timing, she still must "present ... direct evidence of retaliatory animus or circumstantial evidence which adequately demonstrates that an improper motive was a substantial motivation in the employer's decision." *Gonzagowski v. Widnall*, 115 F.3d 744, 749 (10th Cir.1997). Plaintiff has failed to establish a prima facie case that GM subjected her to retaliatory harassment. Summary judgment on plaintiff's retaliation claim is granted.

### E. ADA Claim

Plaintiff claims that she was subjected to unlawful discrimination and harassment based on her alleged disability. The ADA prohibits discrimination "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Discrimination under the ADA includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless ... the accommodation would impose an undue hardship...." 42 U.S.C. § 12112(b)(5)(A). A "qualified individual with a disability" is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Thus, to establish a prima facie case under the ADA, plaintiff must demonstrate (1) that she is "disabled" within the meaning of the ADA; (2) that she is qualified-with or without reasonable accommodation; and (3) that she

was discriminated against because of her disability. *Siemon v. AT&T Corp.*, 117 F.3d 1173, 1175 (10th Cir.1997).

### 1. "Disabled"

 Defendants argue that plaintiff is not disabled within the meaning of the ADA. The ADA defines the term "disability" as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). Plaintiff asserts that she suffers physical impairments to her back, neck, shoulder, and ankle, and that she suffers from right carpal tunnel syndrome.

### a. Impairment that Substantially Limits Major Life Activity

### i. Lifting, Reaching, Pushing, and Pulling

Plaintiff contends that she is substantially limited in the major life activity of performing manual tasks such as lifting, reaching, pushing, and pulling. There exists no question of fact that plaintiff suffered certain physical impairments-plaintiff has offered evidence of certain injuries and the fact that she has been diagnosed as having carpal tunnel syndrome. Plaintiff's current impairments apparently limit her ability to work over her head for extended periods of time, lift more than 25 pounds, or engage in certain repetitive movement.

 The performance of manual tasks, such as lifting, constitutes a major life activity. *See Lowe v. Angelo's Italian Foods, Inc.*, 87 F.3d 1170, 1172 (10th Cir. 1996) (lifting is major life activity). However, to be actionable under the ADA, plaintiff must establish that her impairments

...

substantially limited her in a major life activity.

■ To be substantially limited in performing manual tasks, an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives. *Toyota Motor Mfg., Kentucky, Inc. v. Williams,* 534 U.S. 184, 198, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002). The impairment's impact must also be permanent or long term. *Id.* (citing 29 C.F.R. §§ 1630.2(j)(2)(ii)-(iii) (2001)).

The court is guided by the recent Supreme Court decision in *Toyota Motor.* In *Toyota Motor,* the Court rejected a lower court's analysis, which focused merely on the plaintiff's inability to perform manual tasks associated only with her job. The Supreme Court directed that, "[w]hen addressing the major life activity of performing manual tasks, the central inquiry must be whether the claimant is unable to perform the variety of tasks central to most people's daily lives, not whether the claimant is unable to perform the tasks associated with her specific job." *Id.* at 200–01, 122 S.Ct. 681. The Court further stated:

> At the same time, the Court of Appeals appears to have disregarded the very type of evidence that it should have focused upon. It treated as irrelevant "[t]he fact that [respondent] can … ten[d] to her personal hygiene [and] carr[y] out personal or household chores." Yet household chores, bathing, and brushing one's teeth are among the types of manual tasks of central importance to people's daily lives, and should have been part of the assessment of whether respondent was substantially limited in performing manual tasks.

*Id.* 201–02, 122 S.Ct. 681 (citation omitted).

In this case, plaintiff's own deposition and pleadings show that she is not limited in her activities of daily living in a manner

that might constitute a disability under the ADA. To the contrary, plaintiff engages in a wide range of activities despite her alleged physical problems, and is fully capable of taking care of herself, her home, her pets, and assorted family members. Plaintiff bathes and grooms herself without assistance, drives a car and performs all of her own housework, which includes cooking for herself, vacuuming, dusting, and scrubbing her bathrooms. Further, plaintiff currently owns and takes full care of two dogs, and has in recent years cared for as many as six other canines at once. On occasion, plaintiff takes care of her minor grandchildren overnight in her home. In addition, plaintiff mows and rakes her own lawn, regularly gardens and engages in landscaping activities. Plaintiff's allegations do not show her impairments, even in the aggregate, substantially limit her overall daily function. Such a showing is required under *Toyota Motor.*

■ In addition, with respect to plaintiff's specific lifting abilities, it is well settled that a general lifting restriction typically is not sufficiently severe to constitute a disability. *Scott v. Wal–Mart Stores, Inc.,* 2001 WL 584340, at *8 (D.Kan. May 16, 2001) (citing *Helfter v. UPS, Inc.,* 115 F.3d 613, 617 (8th Cir.1997) (holding ten-to twentypound lifting restriction is not a disability)); *Ray v. Glidden Co.,* 85 F.3d 227, 229 (5th Cir.1996) (holding ten-pound lifting restriction is not a disability). Where an impairment is not so severe that it is substantially limiting on its face, an ADA plaintiff must present "evidence comparing her … restrictions to that of an average person." *Velarde v. Associated Reg'l & Univ. Pathologists,* 61 Fed.Appx. 627, 629, (10th Cir. April 2, 2003) (citing *Lusk v. Ryder Integrated Logistics,* 238 F.3d 1237, 1240 (10th Cir.2001)). "[U]nless an ADA plaintiff can show that [her] impairment reduces [her] capabilities sig-

nificantly below those of the average person, [she] is not deemed 'disabled' under the Act." *Id.* In this case, plaintiff merely states that the "facts are in dispute as to the time, duration and extent of her limitations." (Pl.'s Mem. at 116). However, under the law of this circuit, such a generalized contention is insufficient to allow plaintiff's ADA claim to survive summary judgment. *Id.* (affirming summary judgment where plaintiff offered no evidence comparing his lifting abilities to those of the general populace). Plaintiff has not put forth sufficient evidence to show that she was substantially limited in the major life activity of performing manual tasks or lifting, and there is no record to support such an impairment.

### ii. Working

Plaintiff also claims that she is substantially limited in the major life activity of working. Specifically, plaintiff contends that "[d]efendant found that plaintiff was substantially limited in the major life activity of working under the ADA each time it determined that her particular impairment constituted a significant barrier to work and forced her to go out on sick leave [in October 19, 1998 and May 16, 2002 [22]]." (Pl.'s Memorandum at 116). To demonstrate that an impairment substantially limits the major life activity of working, an individual must show significant restriction "in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." 29 C.F.R. § 1630.2(j)(3)(i). "Plaintiff must produce evidence that her overall employment opportunities have been significantly restricted." *Taylor v. Albertson's, Inc.,* 886 F.Supp. 819, 823 (W.D.Okla.1995).

Here, plaintiff has presented no evidence showing a significant restriction in her ability to perform a class of jobs or a broad range of jobs in various classes. In fact, plaintiff is currently engaged in active employment at the plant, performing regular work in the plant's reliability department. Plaintiff has failed to come forward with any evidence that her restrictions preclude her from performing any particular job inside or outside of the GM assembly plant.

Moreover, giving plaintiff the benefit of all reasonable inferences, the court determines that, even if GM determined that plaintiff was unable to perform any job at the plant in 1998 and 2001, thereby "forcing" plaintiff to go on sick leave, plaintiff still has not shown she was substantially limited in the major activity of working. First, both leaves were temporary. Further, following plaintiff's leave in 2001, plaintiff was released to work limited duty, and GM placed plaintiff at her same former reliability job through the ADAPT program, with the restrictions of no overhead lifting and no regular lifting of over 20 pounds above waist level. As a matter of law, plaintiff simply has not shown that her employment opportunities have been restricted, let alone significantly restricted. The court concludes that plaintiff is not substantially limited in the major life activity of working, and there is no record to support such an impairment.

### b. Regarded as Having Such an Impairment

Plaintiff also asserts that GM regarded her as being disabled. In order to establish that an employer regarded a plaintiff as disabled, "an individual must show that the employer regarded him or her as being

---

**22.** While plaintiff refers to May 16, 2002, the court believes plaintiff meant to reference May 16, 2001.

substantially limited in performing either a class of jobs or a broad range of jobs in various classes." *Sutton v. United Air Lines, Inc.*, 130 F.3d 893, 904 (10th Cir. 1997). Plaintiff has put forth evidence that GM's medical department was aware of certain injuries plaintiff has sustained and impairments from which she claims to suffer. However, knowledge of a person's injury does not equate to regarding the person as disabled. *Kidwell v. Bd. of County Comm'rs*, 40 F.Supp.2d 1201, 1221 (D.Kan.1998). Moreover, the plant medical director testified that he did not believe plaintiff suffered from any permanent conditions with respect to her neck and shoulder.

In addition, GM's placement of plaintiff on medical leave in lieu of reassigning her to an alternative position in the plant does not show that GM regarded plaintiff as substantially limited in a major life activity. Plaintiff overlooks the fact that GM's placement decisions were motivated by the restrictions plaintiff presented from her outside health care providers. "Where the recognition of plaintiff's limitations is not an erroneous perception, but is instead a recognition of fact, a finding that plaintiff was regarded as disabled is inappropriate." *Lusk*, 238 F.3d at 1241; *see also Bernard v. Doskocil Cos., Inc.*, 861 F.Supp. 1006, 1013 n. 13 (D.Kan.1994) (stating that the "regarded as" prong "is intended to encompass those situations in which an employee regards someone as disabled based on certain stereotypes or myths, not a situation where a person is regarded as having limitations because a doctor has said so").

There simply is no evidence in the record that GM believed that plaintiff's injuries were permanent or severe, or substantially limited a major life activity. GM has maintained plaintiff as a current employee, and she is presently being allowed to perform regular job duties at the plant. Such a fact effectively rebuts any suggestion that GM regarded her as unable to work. *Doebele v. Sprint Corp.*, 157 F.Supp.2d 1191, 1214 (D.Kan.2001) (defendant's decision to continue giving plaintiff work suggests it believed plaintiff was able to do her job, and defeats ADA "regarded as" claim). No reasonable finder of fact could conclude that GM regarded plaintiff as disabled.

## 2. Reasonable Accommodations

██ Even if plaintiff were able to carry her burden and establish that she is disabled under the ADA, her claim still fails because no jury could find that GM failed to reasonably accommodate any physical impairment from which plaintiff suffered. The evidence in the record shows that, when plaintiff presented restrictions, GM attempted to reassign plaintiff to alternative positions and, if it was unable to find something that met her limitations, plaintiff was placed on a medical leave of absence. The Tenth Circuit has expressly recognized a leave of absence as a form of reasonable accommodation under the ADA. *Hudson v. MCI Telecomms. Corp.*, 87 F.3d 1167, 1168 (10th Cir.1996).

Plaintiff has failed to articulate any specific job or measure she claims was an appropriate accommodation that she requested but was denied. Plaintiff merely claims that she was placed in jobs that violated her restrictions and denied jobs that fit them. However, plaintiff fails to set forth facts that she was unable to perform the jobs into which she was placed. Moreover, plaintiff has not identified an available position that she deemed a reasonable accommodation which was denied. The fact that plaintiff may have wanted to be reassigned and continue working or that plaintiff did not receive the accommodation of her choice does not

raise a genuine issue of fact in these circumstances:

> The ADA does not require that an employer provide the best accommodation possible to a disabled employee.... Nor is an employer required to accommodate a disabled employee in exactly the way he or she requests.... The employer providing the accommodation has the ultimate discretion to choose between effective accommodations, and may choose the less expensive accommodation or the accommodation that is easier for it to provide.

*Kuehl v. Wal–Mart Stores, Inc.*, 909 F.Supp. 794, 803 (D.Colo.1995) (citations and internal quotations omitted).

### 3. Disability Harassment

The court has found that plaintiff has failed to establish that she was disabled or regarded as disabled under the ADA. As such, plaintiff's disability harassment claim also fails. GM is entitled to summary judgment on plaintiff's ADA claim.

## IV. The Union

Plaintiff alleges three theories upon which she claims the Union is liable. First, plaintiff claims that the Union directly discriminated against her by harassing and discriminating against her on the basis of her race, sex, age and/or disability and that after she complained, she was harassed and retaliated against by the Union. Second, plaintiff claims that her complaints were disregarded and that the Union failed to represent or assist plaintiff with regard to her complaints of discriminatory treatment by her employer. Finally, plaintiff claims that the Union is liable for failure to take any action against the discriminatory employment practices by GM.

### A. Direct Discriminatory Treatment by the Union

■ Title VII prohibits a union from discriminating against its members of the basis of race or sex. 42 U.S.C. § 2000e–2(c). A union also may not discriminate against an individual based on age or disability. 42 U.S.C. § 12111(2)(ADA); 29 U.S.C. § 630(b),(d) & (e) (ADEA). With respect to allegations of union discrimination, only acts or comments committed or made by union representatives—during the time period when those individuals were agents of the union—may properly support claims against the union on a theory of direct liability. *Witt v. Roadway Express*, 136 F.3d 1424, 1431 (10th Cir. 1998) ("According to the general rule, [a union] is not liable for the acts of co-workers who are not agents or representatives of the union.").

### 1. Harassment

With respect to plaintiff's claim of union harassment, the court observes a complete lack of evidence supporting plaintiff's claim. To survive summary judgment on plaintiff's harassment claim, plaintiff must put forth evidence that one or more union representatives subjected plaintiff to "discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the [plaintiff's] employment and create an abusive working environment." *O'Shea v. Yellow Tech. Servs., Inc.*, 185 F.3d 1093, 1097 (10th Cir. 1999).

There is nothing in the record to support an inference that any union official subjected plaintiff to harassment. To the contrary, in her deposition, plaintiff could not recall any comment or conduct by a union official which was inappropriate in terms of plaintiff's race, gender, age, or purported disability. Specifically, plaintiff could recall no discriminatory remarks made by her zone committeemen Sonny Lyman and John Melton, her committee person Tim Mallet, her shop chairman Danny Mallet, Financial Secretary Dan

Fairbanks, Vice–President Dave Moreno, President Jim Russell, or International Representative Wilbert Neal. Summary judgment in favor of the Union is appropriate. *Thompson v. United Transp. Union,* No. 99–2288–JWL, 2000 WL 1929963, at *8 (D.Kan. Dec.19, 2000) (granting summary judgment on plaintiff's sexual harassment claim where plaintiff could identify only a handful of comments made by union officials).

### 2. Discrimination

■ Regarding plaintiff's claim of Union discrimination, plaintiff must show either intentional discrimination or evidence that plaintiff was treated differently than similarly situated union members. *Richardson v. Bakery, Confectionary & Tobacco Workers, Local No. 26,* 92 F.3d 1197, 1996 WL 422070, at *2 (10th Cir. July 29, 1996) (unpublished). In this case, plaintiff does not argue, nor are there any facts from which to infer, that the Union treated similarly situated non-minority, male, younger, or non-disabled union members more favorably. While plaintiff alleges that the Union failed to assist or protect plaintiff in connection with her claims of discrimination against GM, there is nothing in the record to suggest that other similarly situated union members received preferential assistance or treatment with regard to their complaints. Thus, to the extent plaintiff claims that the Union is directly liable for discrimination, that claim fails. *Thompson,* 2000 WL 1929963, at *8 (granting summary judgment on plaintiff's sex discrimination claim where plaintiff failed to set forth specific allegations that the union treated plaintiff differently from similarly situated male members in its representation of her).

### 3. Retaliation

■ Plaintiff claims that the Union retaliated against her by refusing to process her grievances. While generally it is possible to find retaliation when a union refuses to represent an employee because the employee has opposed illegal discrimination by the employer, *see Romero v. Union Pac. R.R.,* 615 F.2d 1303, 1310 (10th Cir.1980), the facts do not support such a finding in this case. The record is replete with grievances filed by the Union on plaintiff's behalf, some of which were settled and some withdrawn. In fact, the record demonstrates that in December of 1998, the Union pursued grievances which led to the removal of discipline from plaintiff's personnel file. The fact that plaintiff may not have been completely satisfied with the resolution of her grievance does not give rise to an inference of retaliatory motive. The Union has no obligation to pursue every grievance to arbitration, and grievances without merit may be withdrawn. *Vaca v. Sipes,* 386 U.S. 171, 191–92, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). Significantly, plaintiff never appealed the withdrawal of any of her grievances, and there is no evidence that grievances were withdrawn for retaliatory purposes.

Plaintiff also asserts that the Union refused to file certain grievances. However, with respect to the noose incident, the court points out that plaintiff was not even present when the noose was found, and the Union filed a grievance on behalf the employee who, in fact, discovered the noose. Further, regarding the towing incident, there are no facts to infer that the towing of plaintiff's vehicle was racially motivated. Moreover, plaintiff alleges no specific facts regarding the underlying conduct of Miraglia, against whom she claims she wanted to file a grievance in 2000. Plaintiff also claims she wanted to file a grievance against supervisor Lynn Vansell, but that her request was refused. The court points out that, while committee person Gary Cramer refused to write a grievance for plaintiff against Vansell, Cramer did write a grievance for plaintiff at the time against

Steve Clark and Al Milan, thereby discrediting plaintiff's argument that the Union was refusing to file grievances for plaintiff. Finally, plaintiff asserts that the Union refused to file a grievance in 1999 based on plaintiff's alleged disability and GM's alleged refusal to accommodate plaintiff, but plaintiff again fails to provide the court with any specific information to determine whether the Union should have indeed filed a grievance for plaintiff.

Plaintiff merely rests her retaliation claim on the fact that she raised multiple claims of discrimination over the course of her employment. However, as noted previously, plaintiff may not simply hold the Union hostage by proclaiming that any failure to process or file a grievance is discriminatorily motivated. *Hernandez,* 975 F.Supp. at 1427. There simply is no evidence in the record that the Union retaliated against plaintiff by refusing to file or pursue valid grievances.

### B. Failure to Assist

■ Plaintiff claims that the Union disregarded her complaints and failed to represent or assist her with regard to her complaints of discriminatory and unfair treatment by her employer. A union's deliberate refusal to file grievable discrimination claims violates Title VII. *See Goodman v. Lukens Steel Co.,* 482 U.S. 656, 667–69, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987). To establish a prima facie case against a union under Title VII for failing to file a grievance, plaintiff must demonstrate that (1) the employer violated the collective bargaining agreement with respect to plaintiff; (2) the union permitted the violation to go unrepaired, thereby breaching the union's duty of fair representation; and (3) there was some indication that the union's actions were motivated by discriminatory animus. *York v. Am. Tel. & Tel. Co.,* 95 F.3d 948, 955–56 (10th Cir.1996).

■ The court turns to the issue of whether the Union permitted a discriminatory violation to go unrepaired, thereby breaching the Union's duty of fair representation. As briefly stated above, a union is not required to file or pursue meritless grievances. As stated in *York,* 95 F.3d at 956:

> [A union] is not compelled ... under Title VII, to pursue an individual member's grievance if the union reasonably disagrees with the basis for that grievance. A union's statutory duty of fair representation does not oblige it to take action on every grievance brought by every member. Indeed, if a union could be compelled to take official action on every grievance, irrespective of merit, the union would quickly deplete its resources and credibility; and the arbitration machinery would eventually become overburdened.

*Id.* at 956 (citing *Vaca,* 386 U.S. at 191–92, 87 S.Ct. 903).

The record clearly indicates that the Union accepted numerous grievances on plaintiff's behalf and processed those grievances through the grievance mechanisms. Moreover, plaintiff never appealed the withdrawal of any of her grievances. Simply because plaintiff filed a host of grievances, some of which were withdrawn or compromised at various steps, does not mean plaintiff can now complain that each and every result was motivated by discriminatory animus.

For example, plaintiff alleges that the Union is liable based upon shop chairman John Melton's withdrawal of plaintiff's February 2000 grievance against Steve Clark. On February 24, 2000, after plaintiff filed a 6A discrimination grievance against Clark based on "harassment, favoritism, and intimidation," plaintiff was interviewed by Barbara Bell, the UAW Civil Rights Chairperson. Plaintiff asked

that Steve Clark stay away from her. Thereafter, plaintiff had no problems with Clark. Clark then retired from GM in 2000, not long after the incident. Plaintiff's grievance was resolved on April 26, 2000 and, at that time, there was no further remedy available which had been requested by plaintiff, as Clark was no longer plaintiff's supervisor. The fact that the grievance was withdrawn by the shop chairman, without further evidence from plaintiff articulating a discriminatory reason for the withdrawal, fails to provide any inference of discriminatory motive on the part of the Union.

Moreover, other than the towing and noose incidents, plaintiff has failed to set forth adequately specific allegations of misconduct on the part of others against whom she desired to file a grievance. It simply is not enough for plaintiff to allege that she wanted to, for example, file a claim against Miraglia in 2000, and that the Union's refusal was discriminatory. To survive summary judgment, plaintiff must put forth facts creating an inference that the Union was not fairly representing plaintiff by refusing to file valid grievances. In this regard, plaintiff has failed.

Further, regarding the towing and noose incidents, the court concludes that those grievances lacked sufficient merit to raise an inference that the Union was discriminatorily refusing to file grievances on plaintiff's behalf. Finally, the court finds a complete lack of evidence raising a reasonable inference that the Union breached its duty of fair representation by seeking filing or processing grievances of similar merit for similarly situated union members. *Martin v. Kan. City Power & Light Co.,* 1996 WL 707099, at *6 (D.Kan.1996). The Union is entitled to summary judgment on this claim.

## C. Acquiescence

■ Plaintiff claims that the Union is liable for its acquiescence of GM's alleged discrimination. The Tenth Circuit has held that "[a] union cannot acquiesce in a company's prohibited employment discrimination and expect to evade Title VII liability for such discrimination." *Romero,* 615 F.2d at 1311. However, mere inaction does not constitute acquiescence. Acquiescence requires (1) knowledge that prohibited discrimination may have occurred and (2) a decision not to assert the discrimination claim. *See Goodman,* 482 U.S. at 669, 107 S.Ct. 2617.

In *Anspach v. Tomkins Industries, Inc.,* 817 F.Supp. 1499 (D.Kan.1993), *aff'd,* 51 F.3d 285, 1995 WL 133385 (10th Cir.1995), this court further defined the contours of liability based upon this theory. In discussing the Tenth Circuit's previous decision in *Romero,* the court in *Anspach* stated:

> This court is not of the view, however, that the *Romero* court intended that a labor organization be held vicariously liable any time an employer commits prohibited discrimination. In *Romero,* there was evidence that the union and the employer were "in the matter together" in delaying Romero's reinstatement because of his natural origin and in retaliation for his having filed a complaint with the EEOC. The court of appeals noted that the union had considerable input on reinstatement, and that the employer and the union had numerous conferences about Romero's situation. There was also evidence that the union threatened Romero that if he refused to dismiss his complaint, the union would wash its hands of him and would not pursue his reinstatement vigorously; moreover, there was evidence that union representatives asked whether they

could punish Romero for complaining to the EEOC.

*Id.* at 1517. The court in *Romero* ulti-mately held that issues of fact existed "with respect to the union's involvement in the alleged discrimination." *Romero,* 615 F.2d at 1311.

■ The court therefore looks to the *Union's* actions in determining whether it is liable for acquiescing in a racial or sexual hostile environment.[23] "If the union fails to oppose sexual harassment, *Romero* stands for the proposition that the union is liable because of its failure to do so, not merely because the discrimination occurred." *Anspach,* 817 F.Supp. at 1517. In this case, there is no evidence in the record that the Union and GM were "in the matter together."

Additionally, there is a lack of evidence that the Union refused to process grievances for plaintiff because she was female or a minority, or because she opposed racial or gender discrimination. Thus, the case at hand differs from *Goodman,* wherein the Supreme Court concluded that the union was liable under Title VII because of its deliberate choice not to process employee discrimination grievances. "The Unions, in effect, categorized racial grievances as unworthy of pursuit and, while pursuing thousands of other legitimate grievances, ignored racial discrimination claims on behalf of blacks, knowing that the employer was discriminating in violation of the contract." *Goodman,* 482 U.S. at 669, 107 S.Ct. 2617.

As already stated, the Union filed and pursued numerous grievances on behalf of plaintiff, many of which alleged racial or sexual harassment. In fact, the courts notes that the record contains at least ten grievances filed on behalf of plaintiff claiming either racial or sexual harassment. The court also points out that the Union filed a grievance on behalf of Mildred Woody regarding the noose incident. Further, as a result of the various meetings plaintiff had with union representatives, additional training was established to educate workers at the plant regarding the racist symbolism of the noose. No rational jury could find that the Union deliberately chose not to file or process employee discrimination grievances. Plaintiff cannot survive summary judgment on her claim that the Union acquiesced in GM's alleged hostile work environment.

With respect to plaintiff's claims against the Union, plaintiff has failed to set forth evidence sufficient to raise a genuine issue of material fact that the Union discriminated against plaintiff. The Union is entitled to summary judgment.

**IT IS THEREFORE ORDERED** that UAW and Local 31's Motion for Summary Judgment (Doc. 76) is granted in its entirety. Defendants International Union, United Automobile, Aerospace and Agricultural Implement Workers of America and Local No. 31 of the International Union, United Automobile, Aerospace and Agricultural Workers of America are hereby dismissed from this action.

**IT IS FURTHER ORDERED** that General Motor's Motion for Summary Judgment (Doc. 78) is granted in part and denied in part. With respect to plaintiff's claims of racial and sexual hostile work environment, summary judgment is de-

---

**23.** The court already has determined that genuine issues of fact exist only with regard to plaintiff's racial and sexual hostile environment claims. As such, the Union may be held responsible only for these alleged discriminatory practices. *Seymore v. Shawver & Sons,*

*Inc.,* 111 F.3d 794, 798 (10th Cir.1997) (holding that, where an employer did not engage in unlawful discrimination under Title VII, a union may not be held responsible under Title VII for the employer's actions).

nied. The court grants summary judgment to GM on all other claims.